OPINION OF THE COURT
Sara P. Schechter, J.
The case at bar, a termination of parental rights case based upon grounds of “severe abuse”, presents several issues that require the court to interpret chapter 7 of the Laws of 1999 (hereinafter NY-ASF A or the new Act), which became effective on February 11, 1999:
• whether the newly created felony sex offense grounds for termination of parental rights are applicable to a case filed prior to the effective date of the new Act;
• whether a derivative finding of “severe abuse” may be made pursuant to Social Services Law § 384-b (8) (a) (i) and (ii) concerning siblings of a severely abused child;
• whether a finding of “aggravated circumstances” as defined in section 1012 (j) of the Family Court Act may be made after the filing of a termination of parental rights petition; and
*267 • whether diligent efforts may be excused in a termination of parental rights proceeding on the grounds of severe abuse when a finding of “aggravated circumstances” has not previously been made in the proceeding pursuant to which the subject child was placed.
The petitions were granted from the Bench for the reasons stated herein.
Chapter 7 of the Laws of 1999 was designed to bring New York into conformity with the Federal Adoption and Safe Families Act of 1997 (Pub L 105-89, 111 US Stat 2115, codified as amendments to scattered sections of 42 USC [hereinafter Federal ASFA]), passed by Congress in November of 1997. Federal ASFA required States receiving Federal subsidies for foster care services to enact conforming legislation or forfeit Federal funding. ^
Federal ASFA has two primary purposes: first, to mandate that children’s health and safety must always be paramount concerns of the child welfare system, and second, to expedite permanency planning.[1] The first goal is an attempt to redress perceived excesses in the application of the “reasonable efforts” requirements of the Adoption Assistance and Child Welfare Act of 1980 (Pub L 96-272, 94 US Stat 500, codified as amendments to scattered sections of 42 USC). To reduce the chances of a child’s being returned to unrehabilitated abusive or neglectful parents, Federal ASFA has created certain categories of cases in which “reasonable efforts” are not required. To expedite permanency planning, the Federal statute has created a process of court reviews of a child’s progress in foster care and specified time frames in which permanency goals must be achieved. Since the sole purpose of chapter 7 of the Laws of 1999 is to comply with Federal ASFA,[2] the court must attempt to interpret the New York legislation in a manner consistent with the Federal law.
FACTS
Respondents lived together with the children: Shaina, born April 5, 1989; Vivian, born February 8, 1993; and Marino, Jr., born September 25, 1995. Respondent T. is the mother of all three children. Respondent S. is the father of the two younger children. Shaina’s biological father is not a person whose *268 consent to the adoption of Shaina is required under Domestic Relations Law § 111, nor is he entitled to notice of this proceeding pursuant to Social Services Law § 384-c. Respondents T. and S. were never married.
In the early morning hours of July 31, 1997, S. raped Shaina, who was then eight years old. Vivian, then 4V2 years old, was sleeping in the same bed. The rape caused Shaina internal injuries and profuse arterial bleeding. For the next two hours, the respondents remained in their apartment with the children, while Shaina vomited and complained of abdominal pain. During this time, they concocted a story to conceal the fact that S. had spent the night in the apartment, cleaned the apartment, folded and stowed away the mattress on which S. slept, washed away some of the blood (although smears remained when the police searched the apartment on August 1st), and removed various bloodstained items of clothing from the premises.
At about 8:40 a.m., the respondent mother, having brushed Shaina’s hair and put a sanitary napkin on her, called a taxi and took the child from the apartment on 118th Street to a clinic on 3rd Street. On the way, they passed several closer medical facilities, including Metropolitan Hospital. Upon arrival at the clinic, the mother told the clinic personnel that Shaina was having a menstrual period and that she had tripped over a small chair in her bedroom. Seeing the child’s condition, the clinic doctor did not attempt more than a superficial examination, but instead immediately called EMS, which transported the child to Bellevue Hospital. Shaina’s medical status upon arrival at Bellevue at 11:55 a.m. was listed as “likely to die.” Surgery was performed to repair the laceration to her vaginal wall, and she was able to leave the hospital nine days later. After a psychological evaluation in September of 1997, she was diagnosed as suffering from posttraumatic stress disorder and major depression. Antidepressant medication was prescribed for her, and she has been receiving psychotherapy from a sex abuse specialist ever since.
The evening of the rape the respondent mother was questioned by a detective from the Manhattan Special Victims Squad. The mother repeated the story about Shaina’s having tripped over the chair. When asked why she and S. had tried to conceal the fact that he was present in the apartment, the mother related that S. had been involved in several similar incidents. One involved an eight-year-old cousin visiting from Georgia in the summer of 1996. This child, while staying at the *269 respondents’ home, fell from a cabinet, hit herself between the legs and had vaginal bleeding. She was taken to the same clinic, 115 blocks from respondents’ home, to which the respondent mother took Shaina on July 31, 1997. Another involved the sister of the respondent mother, also a little girl, who alleged that S. had tried to sexually abuse her. This incident resulted in S.’s arrest, but the charges were dropped.
There had also been at least two prior allegations concerning Shaina. In one instance, she too had been climbing on a cabinet and fell in a way that caused vaginal bleeding. The second, in 1994, was an allegation of sodomy investigated by the Administration for Children’s Services (hereinafter ACS). This report was deemed unfounded after Shaina recanted the allegations. Although the portions of the ACS record in evidence are devoid of any medical examination or expert sex abuse assessment, they are replete with the mother’s statements that she was sickened by what S. was alleged to have done, that she no longer had contact with him, and that under no circumstances would she permit him to have any future contact with Shaina.
In addition to the investigating detective, Shaina’s godmother, who was the source of at least one of the prior reports to ACS, also testified in the termination of parental rights proceeding. Her testimony, neither impeached nor refuted, was that Shaina had repeatedly complained that S. was touching her private parts. Using child’s terms, she had told the godmother that S. was touching her vagina with his penis and that he put his penis in her mouth. This witness has had a close relationship with Shaina throughout her life, and the child frequently spent weekends in the godmother’s home. At bath time, Shaina often complained that her bottom hurt, and the godmother observed redness and rashes on several occasions. She also noticed that no matter how carefully she tried to clean the child, Shaina often had a foul odor emanating from her vaginal area. The godmother discussed these concerns with Shaina’s mother. At least once she prompted Shaina to tell her mother of S.’s molestation in the godmother’s presence. In response, the respondent mother slapped Shaina in the mouth with sufficient force to knock the child off balance and said, “Don’t lie.”
The respondents were arrested during the night of July 31-August 1, 1997, and have been incarcerated ever since. After arresting the respondent mother, the detective told her that S. had made a videotaped statement that he had raped her daugh *270 ter. She replied that she didn’t believe it. The mother was then placed in the same police vehicle with S. to be transported to night court. In the car the respondents kissed, and the mother told S. that she would meet him later at his mother’s house.
The children have been in nonkinship foster care under the auspices of the Angel Guardian Home continuously since the arrests of the respondents. It is undisputed that the agency has made no efforts to plan with either respondent for the return of the children to their care, except that pursuant to court order the agency did schedule some visits with the children by various members of the extended families of the respondents.
PRIOR LEGAL PROCEEDINGS
Criminal proceedings against S. resulted in his admission on March 26, 1998 to rape in the first degree (Penal Law § 130.35). As a predicate felon (with a prior kidnaping conviction) he received a determinative sentence of 15 years, a so-called “flat fifteen.” T., on December 5, 1997, pleaded guilty to reckless endangerment in the first degree (Penal Law § 120.25). The conduct to which she admitted was having delayed taking Shaina to the doctor after the rape, while she and S. discussed what they would tell the authorities, and having given a false history to the hospital about the child’s supposed fall over a chair. Although it is not an essential element of the crime of reckless endangerment in the first degree that the person or persons endangered be identified, T. specifically acknowledged in her admission that as a result of her actions, Shaina’s life was placed in grave danger. On January 16, 1998 she was sentenced to a maximum term of three years, with a one-year minimum. She will be eligible for parole in July of this year.
Child abuse proceedings before this court culminated on May 11, 1998, in a finding of abuse against S. (charged as a “person legally responsible”) based upon his conviction for the rape of Shaina. Derivative findings of abuse were made as to Vivian and Marino, Jr. On the same date, a finding was made of child abuse by the respondent mother based upon her criminal conviction, coupled with her admission to this court that she allowed S. access to Shaina despite her knowledge of a prior incident of sex abuse upon this child. Derivative findings were entered as to the two younger children. On October 22, 1998, the children were placed with ACS for one year. This court also entered an order of protection, concurrent with the period of placement, which prohibited contact between the respondents and the children.
*271 CURRENT LEGAL PROCEEDINGS
Petitions to terminate the parental rights of the mother to all three children and of S. to the two younger children of whom he is the father were filed on September 1, 1998, prior to the disposition on the underlying child abuse proceedings. Originally, the petitions alleged abandonment and permanent neglect, with the plea that diligent efforts be excused as such efforts will be detrimental to the best interest of the children. On March 1, 1999, after the passage of NY-ASFA but before the fact-finding hearing had been commenced, the petitions were amended to add new causes of action against both respondents.
As to respondent mother the new causes of action were “severe abuse” pursuant to Social Services Law § 384-b (8) (a) (i) in that “the child has been found to be an abused child as a result of reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child” and “severe abuse” pursuant to Social Services Law § 384-b (8) (a) (ii) in that the respondent mother “knowingly allowed to be committed [upon Shaina] a felony sex offense as defined in [Penal Law] section[ ] * * * 130.35.” The first of these two causes of action relies upon the definition of severe abuse as it existed prior to the 1999 amendments; the latter is an addition to the statute from the 1999 legislation. These causes of action were pleaded as to all three children.
As to S., the new causes of action in the amended petitions are “severe abuse” based on the same clauses alleged against the respondent mother, with the exception that S. is alleged to have actually committed the felony sex offense against Shaina.
Simultaneously with the amendment to the termination of parental rights petitions, ACS and Angel Guardian Home jointly moved in the underlying Family Court Act article 10 proceeding for a finding of “aggravated circumstances” and a ruling pursuant to newly enacted Family Court Act § 1039-b that diligent efforts to reunite the respondents with the subject children are not required. One hearing was conducted in which the evidence offered in support of the fact finding in the termination of parental rights petitions was also considered in relation to the motion. Since “severe abuse” always constitutes an “aggravated circumstance” (Family Ct Act § 1012 [j]), diligent efforts are not required unless the court finds “that providing reasonable efforts would be in the best interests of the child, not contrary to the health and safety of the child, and would likely result in the reunification of the parent and the *272 child in the foreseeable future.” (Family Ct Act § 1039-b [b] [6].)
APPLICATION OF THE NEW ACT TO THE PENDING PROCEEDINGS
Respondents challenge the “retroactive” application of the new legislation to the pending proceedings. They do not contest the amendment of the petitions on procedural grounds, as they received adequate time to answer and prepare for trial on the new causes of action. Rather, they contend that the new statute is “prospective”, which they assert to mean, at least, that it cannot be applied to cases where termination of parental rights petitions were filed prior to the passage of NY-ASFA. In addition, they argue that a finding of “aggravated circumstances” in a Family Court Act article 10 proceeding must be made at an earlier stage and that to make such a finding at this point constitutes an improper and unconstitutional application of the new statute. If this interpretation were correct, the causes of action based upon Social Services Law § 384-b (8) (a) (ii), the newly enacted felony sex offense clause, would have to be dismissed and the motion by ACS for a finding of “aggravated circumstances” would have to be denied as untimely. It is clear, however, that those portions of the new legislation implicated in the current proceedings were meant to be applied to all children in foster care as of the effective date of NY-ASFA.
New statutes are presumptively prospective. (McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [c].) If a new statute is remedial in nature, however, it may be applied retroactively unless such application would impair vested rights. (McKinney’s Cons Laws of NY, Book 1, Statutes § 54.) In determining whether a statute should be applied retroactively, the first step is to look at the language of the statute itself. Federal ASFA by its express terms is applicable to all children in foster care on the date of its enactment. Accordingly, to comply with the Federal law, NY-ASFA must also apply to those children. Further, the provision in NY-ASFA that termination of parental rights petitions are to be filed for all children in care for 15 of “the most recent” 22 months (Social Services Law § 384-b [3] [Z] [i]) clarifies the new statute’s applicability to the subject children.
Review of the legislative goal is central to the retroactivity analysis. (Matter of OnBank & Trust Co., 90 NY2d 725 [1997].) Statutes affecting the welfare of children and furthering important public policies are generally given retroactive effect. *273 (See, Matter of Fetherston v Fetherston, 172 AD 2d 831 [2d Dept 1991] [Child Support Standards Act]; John R. v Marlene C., 179 Misc 2d 72 [Fam Ct, Kings County 1998] [statute barring visitation to parent convicted of murder of the other parent].) The overriding mandate of Federal ASFA is to clarify that in making “reasonable efforts” to reunify children with their birth families, “the child’s health and safety shall be the paramount concern.” (Pub L 105-89, 111 US Stat 2115, 2116, § 101 [a], amending 42 USC § 671 [a] [15] [A].) New York has duly incorporated this language into various sections of the Family Court Act and Social Services Law, including Social Services Law § 384-b (1). According to the Assembly memorandum in support of the new Act, however, this new language is consistent with “the existing law in New York that the health and safety of the child were always the paramount concern in providing reasonable efforts to prevent placement and promote reunification. It does not represent a change in law, policy, or emphasis in New York.” (Mem of Assembly in Support, 1999 McKinneys Session Law News of NY, at A-20 [“justification” section].) Viewed in this light, NY-ASFA is merely an attempt to refine the law concerning permanency planning for children in foster care so that New York law more fully and expeditiously accomplishes its preexisting goals. The new statute neither creates new rights nor abrogates preexisting ones, vested or otherwise. Like the Equitable Distribution Law (Domestic Relations Law § 236 [B]), NY-ASFA is designed to “modify and expand remedies already available”, and, therefore, may properly be applied even to proceedings filed before the passage of the new legislation. Valladares v Valladares, 80 AD2d 244, 252 [2d Dept 1981].)[3] Accordingly, those portions of NYASFA relevant to the current proceedings are remedial and retroactive.
FINDINGS OF SEVERE ABUSE
Petitioner has established by clear and convincing evidence that the respondent mother severely abused Shaina, both by knowingly allowing S. to rape Shaina and by her conduct after the rape that endangered Shaina’s life. T.’s prior knowledge of S.’s molestation of Shaina was proved by the compelling testimony of the investigating detective and the godmother, coupled with T.’s admission to this court in the *274 Family Court Act article 10 proceeding (admissible in the termination proceeding pursuant to section 384-b [8] [d] of the Social Services Law) that she knew of a prior incident of sex abuse of Shaina by S. Her conduct after the rape was proved beyond a reasonable doubt by her criminal conviction. The elements of the crime of reckless endangerment in the first degree precisely match the original language of the severe abuse statute (Social Services Law § 384-b [8] [a] [i]), “reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life.” That Shaina’s life was endangered was further proved in the termination case to a virtual certainty by the medical records.
In the termination of parental rights proceeding, the respondent mother asserted a defense she had not previously raised in either the criminal or the Family Court Act article 10 proceedings, that she herself was abused by S. and was, therefore, powerless to protect Shaina. The sole evidence in support of this defense was a report (admitted by stipulation) of a psychologist who examined the mother on March 9, 1999. This report sympathetically portrays the mother as the victim of a lifetime of rejection and abuse. T., who did not testify in the termination proceedings, recounted to the psychologist that her own father had refused to give her his name and that she had been sexually abused by her stepfather, maternal grandfather and another man during her childhood. Further, her own mother had failed to protect her from this abuse. Although T. did relate that S. had verbally and physically abused her, the picture that emerges from the report is that she was impelled, not by her fear of S., but by her need of him. Above all, she feared that S. would abandon her as her own father had done. She persisted in the fundamentally exploitive relationship with S. because she wanted to be part of a “real family”, that is, one in which the father was present. In sacrificing Shaina to this overwhelming need, the mother was repeating a pattern her own mother had established in allowing her stepfather to remain in the home after she had informed her mother of his abusiveness. Thus, the report establishes neither that the respondent mother’s conduct was prompted by the circumstances of her relationship with S. nor that she would be able to function better as a parent if she were removed from that relationship.[4]
*275 DERIVATIVE FINDINGS OF SEVERE ABUSE
Since the severe abuse of Shaina by the respondent mother was proved by clear and convincing evidence and S.’s severe abuse of Shaina was proved beyond a reasonable doubt by his criminal conviction for raping her, the question that must now be addressed is whether the abuse of Shaina constitutes grounds for termination of either parent’s rights to the younger two children. Only the definition of “severe abuse” relating to prior convictions for murder and specified assault crimes (Social Services Law § 384-b [8] [a] [iii]) directly mentions siblings of the abused child.[5] The wording of the felony sex offense clause may permit such a reading, however: “the child has been found to be an abused child, as defined in paragraph (iii) of subdivision (e) of section ten hundred twelve of the family court act, as a result of such parent’s acts; provided, however, the respondent must have committed or knowingly allowed to be committed a felony sex offense as defined in section [ ] * * * 130.35 * * * of the penal law and, for the purposes of this section the corroboration requirements contained in the penal law shall not apply to proceedings under this section” (Social Services Law § 384-b [8] [a] [ii]).
Petitioner contends that since the statute is silent concerning whom the felony sex offense must have been committed upon, the plain meaning of the language is that any Family Court Act article 10 finding of sex abuse (not necessarily based upon a felony sex offense), coupled with a finding that the respondent committed or knowingly allowed to be committed a felony sex offense upon anyone supports termination of parental rights. Under this interpretation, a felony sex offense upon a child for whom the respondent has no legal responsibility, or even upon an adult, would satisfy the statute. Such an interpretation would approach absurdity, and it is presumed that the Legislature did not intend an absurd result. (McKinney’s Cons Laws of NY, Book 1, Statutes § 145.)
*276 What is more probable, given the well-developed body of case law concerning derivative findings of abuse in article 10 proceedings, is that the Legislature contemplated the development of a similar body of case law concerning derivative findings of “severe abuse”, not only those predicated upon felony sex offenses, but upon all the statutorily defined forms of severe abuse. Like the termination of parental rights statute, article 10 of the Family Court Act is silent concerning derivative findings of abuse. The only indirect support for derivative findings in article 10 is found in section 1046 (a) (i), which makes proof of the abuse or neglect of one child admissible as to any other child. Nevertheless, derivative findings are commonly made and are supported by appellate decisions.
Derivative findings in article 10 proceedings are predicated upon the common understanding that a parent whose judgment and impulse control are so defective as to harm one child in his or her care is likely to harm others as well. (Matter of Dutchess County Dept. of Social Servs. [Douglas E., III] v Douglas E., Jr., 191 AD2d 694 [2d Dept 1993].) In addition, children who are not the direct targets of the abuse or neglect are also likely to suffer long-term damage (often not provable at the time of the article 10 proceeding) from seeing their siblings so mistreated. In this respect findings of derivative abuse or neglect are similar to findings of neglect based upon domestic violence between adults within the child’s home when no physical injury to the child has occurred. (See, Matter of Lonell J., 242 AD2d 58 [1st Dept 1998].) As the concern is the skewed family dynamic, it is not necessary for the petitioner to prove that the siblings who were not the direct targets are likely to suffer the same injury or even a substantially similar form of mistreatment as the target child. {Matter of Patricia J., 206 AD2d 847 [4th Dept 1994].) Rather, the petitioner’s burden is to show only proximity in time, after which showing the burden shifts to the respondent to show any circumstances that may differentiate the target child from the other children in the household. (Matter of James P., 137 AD2d 461 [1st Dept 1988]; Matter of Daniella HH., 236 AD2d 715 [3d Dept 1997].)
The same reasoning that supports derivative findings in article 10 proceedings compels the conclusion that they are also required in cases of “severe abuse.” The premise of Federal ASFA is that in certain types of cases, including severe and repeated abuse, the dangers of reunification efforts often *277 outweigh any potential benefit.[6] Where, as in the present case, a respondent’s severe abuse of one child is proximate in time with his or her care of another child and the respondent has been unable to demonstrate any meaningful distinction between the children, the law should protect both children fully and equally. The necessity for such protection is vividly illustrated by the case at bar, where the younger sibling slept in the same bed while the target child was raped.
Another practical concern is that without derivative findings of severe abuse, the sibling of a severely abused child would be on a different permanency planning track from the target child. Under the new law, when a court finds pursuant to Family Court Act § 1039-b that “aggravated circumstances” exist (synonymous with “severe abuse”) and that reunification efforts are not required, the foster care agency is then required to locate an adoptive home for the child and may be ordered to file a petition to terminate parental rights. (Family Ct Act § 1039-b [b].) If the agency is required to continue to make efforts to reunite the sibling with the respondent, however, termination petitions could not be filed at the same time on the sibling’s behalf and he or she probably could not be moved to the adoptive home located for the target child. Since New York child welfare law and policy strongly favor keeping siblings together, the result would be either an undesirable separation of the siblings or reluctance to use section 1039-b to expedite permanency planning for the target child, thus frustrating AS-FA’s purposes in a substantial number of cases.
DILIGENT EFFORTS
As discussed above, a central feature of Federal ASFA is its clear direction that “reasonable efforts” “shall not be required to be made” in cases where a court has found that the parent subjected the child to “aggravated circumstances” as defined in State law. (Pub L 105-89, 111 US Stat 2115, 2116, § 101 [a], amending 42 USC § 671 [a] [15] [D] [i].) NY-ASFA defines “aggravated circumstances” as “severe or repeated abuse” as defined in Social Services Law § 384-b. Thus, it would appear that “reasonable efforts” or “diligent efforts” would never need to be proved in a termination of parental rights case based *278 upon, severe or repeated abuse. NY-ASFA is not clear on this point, however. The diligent efforts requirement of the severe abuse statute as it existed before the passage of NY-ASFA has been retained (in a renumbered clause), and to that language the following new sentence has been added: “the agency has made diligent efforts to encourage and strengthen the parental relationship, including efforts to rehabilitate the respondent, when such efforts will not be detrimental to the best interests of the child, and such efforts have been unsuccessful and are unlikely to be successful in the foreseeable future. Where a court has previously determined in accordance with this chapter or the family court act that reasonable efforts to make it possible for the child to return safely to his or her home are not required, the agency shall not be required to demonstrate diligent efforts as set forth in this section.” (Social Services Law § 384-b [8] [a] [iv] [new language italicized].)
The new language raises several questions: What is “this chapter”? What is a “previous” determination? And what is the relationship between the new language and the preexisting phrase “when such efforts will not be detrimental to the best interests of the child”? Since the Social Services Law contains articles rather than chapters, “this chapter” can only be chapter 7' of the Laws of 1999; in other words, any determination pursuant to NY-ASFA that reasonable efforts are not required relieves the petitioner of its burden to prove diligent efforts.
The timing of a “previous” judicial determination that efforts are not required is a more complicated issue. The respondents and the Law Guardian interpret this language as requiring such a determination in the underlying proceeding (in this case the Family Court Act article 10 abuse proceeding) prior to the initiation of the termination proceeding. The petitioner contends that such a determination can be made within the fact-finding hearing of the termination proceeding or by reopening the article 10 proceeding during the pendency of the termination proceeding, as was done here. This is an issue of considerable practical significance. A sizable number of cases were ripe for termination proceedings at the time of the passage of NY-ASFA, and even after those cases have made their way through the system one way or another, there will always be certain cases in which new information or evidence of severe or repeated abuse comes to light after the disposition on the article 10 case or after a voluntary placement has been taken.
ASFA mandates the filing of a termination proceeding when a child has been in foster care for 15 of the most recent 22 *279 months, unless the case falls into certain “compelling circumstances” exceptions. (Social Services Law § 384-b [3] [?].) Must the agencies, already greatly burdened with the attempt to meet the new termination filing deadlines, delay the filing of such termination petitions until after they have moved pursuant to section 1039-b of the Family Court Act for a determination that “aggravated circumstances” are present? Such a result would promote neither the child’s need for permanency nor the court’s concern with judicial economy.
An examination of the process by which reasonable efforts may be dispensed with pursuant to Family Court Act § 1039-b demonstrates that it is one route, but not the only route, to that result. Such a determination may also be made in a termination of parental rights proceeding. A motion pursuant to section 1039-b may be made “[i]n conjunction with, or at any time subsequent to, the filing” of an abuse or neglect petition. (Family Ct Act § 1039-b [a].) Thus, the plain language of the statute permits total flexibility as to the timing of the motion, and a motion made simultaneous with a termination” of parental rights petition is not time barred. The correct question, therefore, is not whether it may be made but whether it must be made.
In a section 1039-b motion, the movant is required to show any one of six possible bases for dispensing with reasonable efforts; in this case ACS alleges “aggravated circumstances”, specifically “severe abuse.” Even after “aggravated circumstances” have been shown, however, reasonable efforts are not automatically waived because the New York Legislature has added additional language not present in Federal ASFA, to wit, “unless the court determines that providing reasonable efforts would be in the best interests of the child, not contrary to the health and safety of the child, and would likely result in the reunification of the parent and the child in the foreseeable future.” (Family Ct Act § 1039-b [b].) Although section 1039-b is silent as to burdens of proof, it is apparent that although the burden of proof always lies with the movant, the burden of going forward to establish one of the exceptions in the “unless” clause must shift to the respondent. Otherwise, the two parts of the subsection would cancel each other out and New York would not be in compliance with Federal ASFA.
When the article 10 court determines that reasonable efforts are not required, a permanency hearing is then scheduled within 30 days, at which hearing the full range of permanency options are open, including return to a parent (presumably a *280 nonrespondent parent or at least not the parent with whom reasonable efforts have been waived). If termination and adoption are the plan, the agency is then required to take appropriate steps to situate the child in an adoptive home and to prepare the termination petition. While these are important reasons that agencies should bring section 1039-b motions as soon as feasible in the planning process, it is the child’s interest in permanency that is being furthered.
The respondents’ contention that this process is designed to let the respondents “know where they stand” is misplaced. Neither respondent has presented any evidence that he or she would have done anything differently if the option had existed at an earlier point to clarify the agency’s obligation to make diligent efforts. In this case, all the steps in this process have already taken place, although they were denominated in preASFA terminology. In the disposition of the article 10 abuse case, with the respondents present and represented by counsel, this court considered the service plan and determined at that time that the respondents should have no contact with the subject children. Moreover, various relatives were considered and deemed inappropriate as discharge resources or kinship foster parents. Since both respondents were incarcerated, the agency was not able to offer them any direct services or referrals, and in any event no services were proposed or requested that this court believed could realistically lead to the safe reunification of these respondents with the children. The termination of parental rights petition had already been filed, and the court ratified the agency’s choice of permanency plan.
Although as an exercise in caution ACS has now made a formal section 1039-b motion in this case, and for the same reason this court has entertained it and granted it on the evidence discussed herein, such motions are unnecessary where a termination of parental rights case has already commenced. Once a termination of parental rights petition has been filed— which a child care agency has discretion to do without court order — the termination case must be tried, and no other permanency goal can be considered at least until the dispositional hearing. Within the termination proceeding itself, the court is, and always has been, required to consider the threshold question of the appropriateness of the agency’s efforts, or lack thereof, to reunify the family. Since the issues in a section 1039-b motion must all be decided in the termination of parental rights fact-finding hearing, the motion is redundant. The determination that diligent efforts are not required may *281 be made in the fact-finding hearing of the termination of parental rights case.
Further, it should be noted that a finding that grounds for termination of parental rights have been established does not automatically result in termination. At the dispositional hearing the court again revisits the question of possible reunification of the family, although the common-law presumption in favor of the biological parents is no longer applicable. If the court finds at that stage that a respondent shows greater promise of rehabilitation than he or she did prior to the initiation of the termination proceeding and that immediate termination of parental rights is not in the best interest of the subject child, the petition may still be dismissed or judgment may be suspended for a specified time in order to give the respondent more time to profit from services. In this case, at the dispositional hearing, the petitioner proved by clear and convincing evidence that the best interests of the subject children would be promoted by freeing them for adoption.[7] The children are placed together in a preadoptive foster home where they are progressing. Each of the children has special needs, however, and they require close supervision, special education, and ongoing therapy.
Finally, the pre-ASFA language of the diligent efforts requirement applicable to termination cases based upon severe abuse expressly empowered the court in a termination case to dispense with diligent efforts when such efforts will be detrimental to the best interest of the child.[8] When a statute is amended, the statute is to be construed as if the original act and the amendments had been passed at the same time. (McKinney’s Cons Laws of NY, Book 1, Statutes § 192.) Thus, the new language is intended to create an alternative, but not exclusive, method by which the determination may be made to dispense with diligent efforts. While respondents do not seriously dispute that both methods coexist, they contend that when an agency seeks the determination within a termination *282 of parental rights case, it bears a higher burden. This is true to the extent that all elements of a termination of parental rights case must be proved by clear and convincing evidence, whereas the movant’s burden in a Family Court Act § 1039-b motion is presumably fair preponderance, no higher standard having been specified. To the extent that respondents argue that a qualitatively different, more individualized type of proof of detriment is required in a termination proceeding, however, that argument must be rejected in the face of ASFA’s unequivocal statement of public policy that children must be protected from depraved parental conduct.[9] The pivotal factor is the severe abuse to which the parents have subjected their children, not the docket number of the case or the timing of the judicial determination that reunification efforts are not required.
Here, petitioner has proved by clear and convincing evidence that both respondents over the course of at least four years engaged in conduct that caused severe, perhaps irreparable, harm to at least one of the subject children. During that period, attempts at intervention by ACS and law enforcement representatives were unavailing. Both respondents have had the opportunity to present evidence that they are capable of rehabilitation. S. presented no such evidence at all. T. presented proof of completion of six-week courses in parenting skills and domestic violence. In addition, one of the counselors that worked with the respondent mother in prison testified that she had seen her for a few individual counseling sessions. She described the mother as initially “in denial”, although, reportedly, she did later begin to develop some insight. The mother discussed with this counselor only the single incident that resulted in her incarceration, however. The counselor recommended that T. receive intensive counseling, which is not available in the prison system. She also testified that upon her release from prison, the mother will reside in a halfway house for six months.
As further proof of her capacity to become a fit parent, the respondent mother offered the psychologist’s report discussed above. That report, however, based upon a current evaluation by a sympathetic clinician, revealed that the mother is still minimizing her role in Shaina’s tragedy, that she is not inclined to discuss her problems, and that she requires at least two *283 years of intensive therapy, which her own expert says has a 70% chance of “moderate” success. Both the length of time required for the respondent mother’s rehabilitation and the uncertainty of its success are inconsistent with the children’s safety and with the legal mandate for permanency. For these reasons, the parental rights of the respondents were terminated and the child care agency was directed to proceed expeditiously with the children’s adoption by the foster parents.

. See, Gordon, Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997, 83 Minn L Rev 637.

. Mem of Assembly in Support, 1999 McKinney’s Session Law News of NY, at A-18 (“purpose or general idea op bill” section).

. Connecticut has held its new ASFA-conforming legislation to be remedial and has applied newly enacted grounds for termination of parental rights to a case whose facts arose prior to the passage of the new grounds. (In re Sheneal W., 45 Conn Supp 586, 728 A2d 544.)

. The respondent mother challenges the facial constitutionality of the new “knowingly allowed to be committed a felony sex offense” grounds for *275 termination as discriminatory against abused women. Assuming arguendo that abused women constitute a protected class for equal protection purposes, T. has not established that she is a member of that class. Accordingly, the questions of whether NY-ASFA violates the Equal Protection Clause of the New York or United States Constitution are not before this court.

. Even the definition of “repeated abuse” in Social Services Law § 384-b (8) (b) (ii) speaks only of the child currently abused and another child for whom the parent is or was legally responsible who has been found within the past five years to have been abused. Thus, that clause is also silent concerning siblings who were not the targets of either the present or the past incident(s) of abuse.

. “[C]lause A [child’s health and safety paramount concern] * * * makes clear that there are some cases in which reasonable efforts do not need to be made to reunify children with dangerous adults. In some cases, no efforts are reasonable efforts. In some cases, any efforts are unreasonable efforts.” (143 Cong Rec S12668-03, S12670 [ASFA sponsor Senator DeWine speaking].)

. NY-ASFA leaves unchanged the higher evidentiary requirements of “clear and convincing, competent, material and relevant evidence” in the dispositional hearing of a severe abuse termination. (Social Services Law § 384-b [8] [f].)

. The juxtaposition in this clause of the phrase “diligent efforts” (used in New York law since 1976) and the Federal term “reasonable efforts” is striking. It seems likely that the Legislature retained the term “diligent efforts” so as to avoid calling into question the substantial body of case law construing that phrase within the permanent neglect grounds for termination. The terms are clearly used interchangeably within the clause, however.

. The impact of Federal ASFA’s mandates is so obvious that the Superior Court of Pennsylvania was influenced by it in a termination of parental rights case decided even before that State passed its implementing legislation. (In Interest of Lilley, 719 A2d 327, 332.)