824 A.2d 213 (2003)
361 N.J. Super. 46
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
A.R.G., Defendant-Appellant,
In the Matter of C.R.G., R.L.G. and A.J.G., Minors.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 2003.
Decided June 5, 2003.
*216 Aglaia Papadopoulos-Vlantes argued the cause for appellant (Papadopoulos-Vlantes & Moehring, attorneys; Ms. Papadopoulos-Vlantes, on the brief).
Pamela A. Redd, Deputy Attorney General, argued the cause for respondent (David Samson, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Redd, on the brief).
Maria Emilia Borges, Assistant Deputy Public Defender and Law Guardian argued the cause for the minors (Yvonne Smith Segars, Public Defender, attorney; Ms. Borges, on the brief).
Before Judges KESTIN, EICHEN and FALL. *214
*215 The opinion of the court was delivered by FALL, J.A.D.
In this child abuse and neglect appeal, we consider whether the proofs presented to the Family Part support the court's finding that "[t]he parent has subjected [his] child to aggravated circumstances of abuse, neglect, cruelty or abandonment[,]" pursuant to N.J.S.A. 30:4C-11.3(a), thereby excusing the New Jersey Division of Youth and Family Services (DYFS or Division) from its statutory obligation under N.J.S.A. 30:4C-11.1(b) to exert "reasonable efforts" to reunify the child, placed in its care and custody by the court, with that parent.
A.R.G. is the father of C.R.G., a male child born on January 2, 1987; R.L.G., a male child born on October 5, 1992; and A.J.G., a male child born on May 16, 1994. *217 M.A.G., the children's mother, died in an automobile accident that occurred on November 7, 1998 in Florida. A.R.G. and M.A.G. had been living in Virginia. However, they separated in 1997. M.A.G. filed a complaint for divorce in the Circuit Court in Virginia and an order granting her custody of the three children was entered on March 25, 1997. The complaint alleged that A.R.G. had subjected M.A.G. to mental cruelty; threatening and emotional abuse; stalking; harassment; marital rape; physical restraint; and destruction of her property. M.A.G. obtained a domestic violence order of protection against A.R.G. on August 4, 1997. During the pendency of the divorce case, M.A.G. obtained permission from the court to move, with the children, to Florida to reside with her parents. After M.A.G.'s fatal accident, the children went to reside with A.R.G., who moved with them to New Jersey to reside in the home of his mother, N.G.
A.R.G. appeals from an order entered on July 17, 2002, denying his motion for reconsideration of an order that had been entered on June 26, 2002, finding that A.R.G's behavior toward the children constituted aggravated circumstances of abuse, neglect and cruelty that excused DYFS from the statutory requirement to exert reasonable efforts to reunify A.R.G. with his children. A.R.G. also appeals from a "permanency order," also entered on July 17, 2002, approving the permanency plan of DYFS to terminate A.R.G.'s parental rights, with adoption of the children by the maternal grandparents, and requiring DYFS to file a guardianship action against A.R.G. by September 18, 2002.
The following factual and procedural history gave rise to this appeal. On May 28, 2002, DYFS received a referral from Ms. Carola, the school nurse at the Hudson Elementary School, 18th Street, Union City, the school attended by R.L.G. and A.J.G., advising that she had observed numerous bruises on the arms, back, buttocks and legs of R.L.G. that had been attributed by the child to a beating by A.R.G. The school had received an anonymous call stating that R.J.G. had been physically abused. It was later determined that C.G.F., A.R.G.'s sister, had reported the abuse to the school after C.R.G. had informed her that A.R.G. had been beating R.L.G.
DYFS caseworker Dionis Burgos responded to the school, met with Nurse Carola, and spoke with the child. R.L.G. advised Burgos that he had been beaten by his father because he had received a negative progress report from school. Burgos observed large black and blue marks on R.L.G.'s right arm and outer forearm; fading red bruises, in addition to eight fading, red belt marks around the area of R.L.G.'s inner right arm; fading black and blue bruises on the child's left arm along with four red, circular belt marks; seven red belt-loop bruises on R.L.G.'s back in the area of the child's left shoulder; and three black and blue belt-loop bruises on the side of his right calf.
Upon further inquiry by Burgos, R.L.G. described a beating that had been inflicted upon him by A.R.G. on May 27, 2002. R.L.G. further informed Burgos that his father often struck him. Burgos also interviewed A.J.G., who verified the information given by R.L.G. N.G., the children's paternal grandmother, appeared at the school to retrieve the children, and was also interviewed by Burgos. N.G. initially informed Burgos that she did not see her son A.R.G. strike R.L.G., but stated that A.R.G. was "always screaming at everyone[,]" and that she feels A.R.G. "went to the extreme." Burgos made arrangements for R.L.G. to be physically examined at the Jersey City Medical Center.
*218 Prior to going to the hospital, Burgos accompanied N.G., R.L.G. and A.J.G. back to their home to obtain various phone numbers and other information that might be needed at the hospital. Upon their arriving at the home, the child C.R.G. appeared and he was also interviewed by Burgos. C.R.G. informed Burgos that R.L.G. "does not get hit all the time only when he gets bad grades[,]" and that A.R.G. had stopped hitting C.R.G. three years ago. C.G.F., who also resided in an apartment at the same premises where the children resided, was also interviewed by Burgos. C.G.F. stated "she was glad the Division had gone to her brother's home[,]" because "[t]he abuse had to stop[,]" and further stated that "[h]er brother even verbally abused his mother."
After examining R.L.G. at the hospital, Dr. Radwan "reported that the child had old bruises and that based on that information he was determining that the child had at least 5 to 6 beatings on his body." No bruises were detected on A.J.G.'s body. Dr. Pellecia also examined R.L.G., and reported that R.L.G. "had 4 to 5 past beatings on his body[,]" and that "[h]e had old, new and healing scars." Dr. Pellecia also stated in his report that the bruises to "[t]he buttock area did not have time to heal and that a new beating was probably done on top of the healing wounds[,]" and "that the buttock area, which was the more seriously injured, would probably leave scars that appeared like birthmarks."
In a second interview of N.G. by Burgos, conducted later that day, N.G. admitted she had been present when the beating to R.L.G. had occurred, but stated that "[A.R.G.] is an aggressive person and she is powerless to stop him." Photographs taken of the bruised areas of R.L.G. graphically depict the results of the severe beating inflicted upon the child by A.R.G. A.R.G. was interviewed by representatives of the Hudson County Prosecutor's Office, and admitted to beating R.L.G. with a belt.
After substantiating the abuse, the Division effected an emergency removal of the children from A.R.G.'s care on May 28, 2002, pursuant to N.J.S.A. 9:6-8.29 to -8.30, and temporarily placed the children into foster care. DYFS also concluded that N.G. had been "neglectful because she did not stop the numerous beatings."
On May 29, 2002, DYFS filed a verified child abuse and neglect complaint in the Family Part against A.R.G., pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12, alleging, inter alia, that
[w]hile in the care and custody of their father, the children were abused and/or neglected in that their father has failed to exercise a minimum degree of care in providing the children with proper supervision or guardianship or by unreasonably inflicting or allowing to be inflicted harm or substantial risk thereof, including infliction of excessive corporal punishment or by any other acts of a similarly serious nature requiring the aid of the court resulting in such children's physical, mental or emotional condition becoming impaired or in imminent danger of becoming impaired.
The complaint also alleged that there was an extensive history of protective service agency involvement in several other states, and that DYFS had requested records from those states. DYFS sought an order granting it custody of the three children "and/or such relief as is provided by law, specifically N.J.S.A. 9:6-8.21 et seq. and N.J.S.A. 30:4C-12, and such other relief as may be warranted."
As a result of the application by DYFS, the trial court entered two orders on May 29, 2002. One order approved and authorized the emergency removal that had been effected by DYFS; placed continued custody of the children with DYFS; prohibited *219 A.R.G. from having any contact with the children; and directed that the matter return to court on June 26, 2002. An order to show cause was also entered on May 29, 2002, directing A.R.G. to show cause on June 26, 2002, why an order should not be entered continuing custody, care and supervision of the children with the Division. The order to show cause also provided for representation of the children by the Office of the Law Guardian, and stated that if A.R.G. was unable to afford counsel he could make application for representation to the Public Defender's Office.
Meanwhile, criminal charges were filed against A.R.G. and he was incarcerated; bail was set at $50,000. A Law Division order entered on May 29, 2002 in the criminal matter prohibited A.R.G. from having any contact with the children. A.R.G. was released on bail on June 7, 2002.
Pursuant to the provisions of the Interstate Compact on the Placement of Children (ICPC), N.J.S.A. 9:23-1 to -18, an order was entered in the Family Part on June 6, 2002, authorizing the priority placement of the children with L.L. and G.L., the maternal grandparents, in the State of Florida.[1]
By letter to all counsel dated June 24, 2002, counsel for DYFS advised, as follows:
Enclosed please find a copy of the evidence packet for the fact finding hearing on Wednesday, June 26, 2002 at 1:30 pm. We anticipate moving these documents in evidence at the upcoming trial pursuant to R. 5:12-4(d). At the hearing a request for a finding pursuant to N.J.S.A. 30:4C-11.3(a) will be made.
Please advise whether you will stipulate to the admissibility of these records. It is understood that in so stipulating you reserve the right to proffer evidence rebutting the contents of the documents.
If you object to a document, please advise me as to the nature of your objection. I anticipate calling one witness from the Division.[2]
At the June 26, 2002 hearing, DYFS moved for a finding that it was not required to exert reasonable efforts to reunify the children with A.R.G., pursuant to N.J.S.A. 30:4C-11.3(a), based upon the presence of alleged aggravating circumstances of the abuse inflicted upon the children by A.R.G.[3] That statute provides, as follows:
In any case in which the Division of Youth and Family Services accepts a child in care or custody, including placement, the division shall not be required to provide reasonable efforts to reunify the child with a parent if a court of competent jurisdiction has determined that:
a. The parent has subjected the child to aggravated circumstances of abuse, neglect, cruelty or abandonment;

b. The parent has been convicted of murder, aggravated manslaughter or *220 manslaughter of a child; aiding or abetting, attempting, conspiring or soliciting to commit murder, aggravated manslaughter or manslaughter of a child; committing or attempting to commit an assault that resulted, or could have resulted, in significant bodily injury to a child; or committing a similarly serious criminal act which resulted, or could have resulted, in the death of or significant bodily injury to a child; or
c. The rights of the parent to another of the parent's children have been involuntarily terminated.
When determining whether reasonable efforts are required to reunify the child with the parent, the health and safety of the child and the child's need for permanency shall be of paramount concern to the court.
This section shall not be construed to prohibit the division from providing reasonable efforts to reunify the family, if the division determines that family reunification is in the child's best interests.
A permanency plan for the child may be established at the same hearing at which the court determines that reasonable efforts are not required to reunify the child with the parent, if the hearing meets all of the requirements of a permanency hearing pursuant to [N.J.S.A. 30:4C-61.2].
[N.J.S.A. 30:4C-11.3 (emphasis added).]
The only witness presented at the fact-finding hearing was Dionis Burgos, the DYFS caseworker. Burgos testified to the results of the investigation by DYFS and produced the various records contained in the DYFS file, including the photographs taken of R.J.G.'s injuries. Over the objection of counsel for A.R.G., the DYFS file was admitted into evidence. After considering the testimony, evidence, and arguments of counsel, the judge stated, in pertinent part:
The Division has proffered 20 photographs of [R.L.G.], and I think the most descriptive photograph would be P-7, the photograph that shows [R.L.G.'s] left arm with bruises on the left forearm....
* * * *
I'm satisfied that the photographs do not overly exaggerate the extent, nature of the injury. Perhaps bruises are more colorful, demonstrative, but certainly the markings indicate a serious savage beating by [A.R.G.] upon the child.
I'm clearly convinced based upon the testimony of Ms. Burgos, the documentation of the medical records, the photographs that the Division has established that [A.R.G.] has abused [R.L.G.] pursuant to [N.J.S.A.] 9:6-8.21.
Additionally, there is argument that the other two children were not abused. [N.J.S.A.] 9:6-8.46 provides for evidence to be considered, proof of abuse and neglect of one child shall be admissible evidence on the issue of abuse and neglect of another child.
I'm satisfied that based on the abuse inflicted upon [R.L.G.] that the other children likewise would be considered victims of abuse and at risk in the care of [A.R.G.]
The Division also requests a determination pursuant to [N.J.S.A.] 30:4C-11.2[4] that they be excused from providing *221 reasonable efforts based upon the child being subject to aggravated circumstances of abuse, neglect, cruelty, or abandonment. I'm satisfied that the Division has clearly established that [R.L.G.] has been subjected to aggravated circumstances of abuse and cruelty.
This is not just punishment for a child's bad progress report in school. This is a serious beating inflicted upon a young child by an adult through the use of a belt.
The Division would be excused from providing reasonable efforts. The children are to continue in the care and custody of the Division. Visitation will continue to be suspended for [A.R.G.]
[A.R.G.] is to comply with the Division's referral for parenting, anger management, along with any referrals made as a result of the psychological evaluation.
[Counsel for A.R.G.] can have her own psychological evaluation. The children can be ... placed with the maternal grandparents in Florida at any time on notice to [the Law Guardian].
The court entered two orders on June 26, 2002, memorializing its findings. In the fact-finding order, the court found that removal and placement of the children was necessary due to imminent danger to their life, safety or health. The order also recited that DYFS had established by clear and convincing evidence that R.L.G. had been abused by A.R.G., and that due to the severity of abuse the other children were at risk for abuse. The order further provided that "reasonable efforts need not be provided." In the second order, entered on return of the order to show cause, the court continued the "no contact" provision until further order of the court; directed that the interstate referral be conducted on the maternal grandparents in Florida; restrained A.R.G. from the home of the maternal grandparents; required A.R.G. to submit to a psychological evaluation, anger management counseling and parenting skills training; and scheduled a permanency hearing for July 17, 2002.[5] That order also stated that the "Division is excused from reasonable efforts."
On or about July 15, 2002, A.R.G. filed a motion seeking a rehearing or reconsideration of the determination by the court that had excused DYFS from providing reasonable efforts to reunify him with the children. The motion also sought an order directing DYFS to provide services to A.R.G., and an adjournment of the permanency hearing. The motion was argued in the Family Part on July 17, 2002. After analyzing the statute, the judge found that the conduct of A.R.G. had constituted aggravated circumstances of abuse and cruelty, and denied the motion stating, in pertinent part:
In this case the evidence presented by the Division, P-1 through P-5, testimony of Ms. Burgos, really shows that [A.R.G.] beat the child, [R.L.G.] with a belt on or about May 27th, 2002. The Division offered statements of the child and in fact the children, [A.J.G. and C.R.G.] that this was not an isolated *222 incident, as offered by [A.R.G.] in his statement to the Prosecutor's Office. [R.L.G.] had reported that he had been hit previously by [A.R.G.] with both belt and by hand, page five of P-4. He also reported to the Division that in the past his father has always hit him. It started in September of 2001. Every time the teacher sent a progress report or report card or a note he would be hit with the belt, P-4 at page 11. [R.L.G.] also said that he was hit every marking period. [R.L.G.] also stated that the beating left him in pain, the contact sheet dated May 30th at P-1.
The medical documentation, P-4 at page three, reflects that the child had lesions in different stages of healing.... Dr. Pellecia ... reported to the Division worker ... that [R.L.G.] had four to five past beatings. Dr. Pellecia opined that he, [R.L.G.], has old, new and healing scars. Photos, P-5, also speak volumes of the savagery of the assault on [R.L.G.] by [A.R.G.]
The Division's evidence also shows that another child, [C.R.G.], told the worker "[R.L.G.] does not get hit all the time, only when he gets bad grades." He claimed that three years ago his father ... stopped hitting him, [C.R.G.]. He would be hit for everything. And that he stood up to his father and the beatings stopped....
[C.R.G.] also stated that his father told him to keep quiet because if anything was revealed he, [A.R.G.], would go to jail....
[C.R.G.] also has described domestic violence between [A.R.G.] and his mother. P 1, a contact sheet from [June 10, 2002], describes [C.R.G.] observing [A.R.G.] hitting the mother of the children.
* * * *
Two of the three children testified to physical abuse of them by [A.R.G.] [A.J.G.] and [C.R.G.] have also witnessed the physical abuse of [R.L.G.] by [A.R.G.]. [C.R.G.] described domestic violence between [A.R.G.] and their mother.
Now our Legislature has recognized the impact on children being exposed to violence in the home. Children, even when they are not themselves physically assaulted suffer deep and lasting emotional effect from exposures to domestic violence. [N.J.S.A.] 2C:25-18. This is not an allegation of domestic violence. The only reason why it's not domestic violence is that the children cannot be victims of domestic violence. But obviously this would be violence in the house, which impacts upon the children who are exposed to the violence, even though not hit themselves.
The evidence presented by the Division through the statements of the childrenand statements of the children are admissible pursuant to [N.J.S.A.] 9:6-8.46describes a systematic and a substantial period ... of physically and emotionally abusing the children. His methods of discipline go beyond the bounds of discipline and in fact reach the level of a cruel and depraved mind.
While these cases are fact sensitive I'm satisfied that the ... abuse rises to the level of aggravated abuse and cruelty....
* * * *
I'm satisfied that I considered all the evidence on June 26th as to the nature of the assault, the continuous assaults upon [R.L.G.]. And in that determination I am still satisfied clearly and convincingly that [A.R.G.] has intimidated and physically assaulted the child. That *223 would satisfy me it was an aggravated circumstance of abuse and cruelty.
The judge then conducted the scheduled permanency hearing. The Division's permanency goal, endorsed by the children's law guardian, was termination of A.R.G.'s parental rights and adoption by the maternal grandparents, with whom the children had been residing in Florida. In approving the plan offered by DYFS, the judge stated, in pertinent part:
The permanency plan of the Division is appropriate. The plan is termination. The Division is excused from providing reasonable efforts. However, they still have to establish each of the four prongs of the best interest test for termination.
Visitation will continue suspended. The no contact order is in place. [Counsel for A.R.G.] can discuss that matter with the prosecutor or make application... on notice to the prosecutor to lift the no contact order.
The children should be referred to a therapist. The therapist should send reports to [the law guardian] and/or the Division as to the children's interest or desire in seeing [or] having contact with their father.
* * * *
All right. But the Division still could explore other options to termination as to [C.R.G.] maybe evenwell, all three actually. [R.L.G.] is about to turn 10. [C.R.G.] is about to turn 15. There may be other options that the Division could explore, such as maybe long term foster care, but it doesn't look like you're going to have enough time for that.
* * * *
The Division should explore any options, discuss the possibility of adoption with the children. [C.R.G.] and [R.L.G.] do have the right to have some input as to that decision.
The judge entered three separate orders on July 17, 2002. One order denied A.R.G.'s motion for reconsideration. A second order continued custody of the children with DYFS, as placed with the maternal grandparents in Florida; directed that A.R.G.'s visitation or contact with the children remained suspended; required a psychological evaluation of A.R.G., as scheduled by DYFS; permitted A.R.G. to obtain his own psychological evaluation; and directed DYFS to explore any options to its permanency plan of adoption by the maternal grandparents. The third order, designated as a "permanency order," approved the Division's permanency plan of termination of A.R.G.'s parental rights, with adoption by the maternal grandparents; stated that the Division need not provide reasonable efforts because the children had been subjected to aggravated circumstances of abuse, neglect and cruelty; and directed the Division to file a guardianship complaint by September 18, 2002.
On August 29, 2002, A.R.G. filed a notice of appeal from entry of the July 17, 2002 order. On September 18, 2002, DYFS filed a guardianship complaint against A.R.G. in the Family Part under docket number FG-09-217-03, seeking termination of A.R.G.'s parental rights.[6] The court then entered an order terminating the child abuse and neglect action as being superseded by the guardianship action. On January 10, 2003, we entered an *224 order directing that the trial in the guardianship case be adjourned pending the outcome of this appeal.
On appeal, A.R.G. presented the following argument for our consideration:
THE TRIAL COURT ERRED IN RULING THAT PLAINTIFF WAS EXCUSED FROM PROVIDING REASONABLE EFFORTS TO REUNIFY DEFENDANT WITH HIS CHILDREN BECAUSE DEFENDANT DID NOT SUBJECT HIS CHILDREN TO AGGRAVATED CIRCUMSTANCES OF ABUSE, NEGLECT, CRUELTY OR ABANDONMENT.
N.J.S.A. 30:4C-11.3, along with several other statutory provisions, was enacted by our Legislature to comply with the Federal Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105-89, 111 Stat. 2115 (1997) (codified as amended in scattered sections of 42 U.S.C.), in order to qualify for the continued receipt of federal funding for New Jersey's child protection system. The overall purpose and scope of ASFA were stated in the report of the House of Representatives Committee on Ways and Means (Committee) to Congress, as follows:
The Committee bill is expected to increase the number of adoptions in the United States. Three major provisions of the bill were designed to produce this increase in adoptions. First, under current law, States must engage in "reasonable efforts" to help families that have abused or neglected their children. Some observers have argued that uncertainty about the reasonable efforts standard sometimes delays State action in making children available for adoption. In response to this problem, the bill requires States to define "aggravated circumstances" in State law, such as child torture or sexual abuse, that would permit the State to bypass the Federal reasonable efforts criterion and move more expeditiously to terminate parental rights and make a child available for adoption. In addition, States would not be required to reunite families in cases where a parent has murdered another child or lost their parental rights to a sibling. Second, the bill provides States with a $4,000 ($6,000 for special needs children) incentive payment for each adoption above the number of adoptions during the previous year. Third, in the case of children under age 10 who have been in foster care for at least 18 of the past 24 months, the bill requires States to move toward terminating parental rights under most circumstances. Taken together, these provisions and associated provisions of the Committee bill can be expected to produce a substantial increase in adoptions in the years ahead.
[H.R. Rep. 105-77, at 7 (1997), reprinted in 1997 U.S.C.C.A.N. 1, 2739-40.]
Prior to the enactment of ASFA, New Jersey required DYFS to meet the more demanding standard of exerting "diligent efforts" in attempting family reunification. ASFA replaced that requirement with the "reasonable efforts" standard, 42 U.S.C.A. § 671(a)(15), and further required the States to adopt legislation excusing state agencies from providing reasonable efforts under certain enumerated circumstances. See N.J.S.A. 30:4C-15.1(a)(3), as amended by L. 1997, c. 175, § 18, eff. July 31, 1997. Here, the pertinent exception permitting States to "bypass" reasonable efforts for reunification is where the state agency can demonstrate the existence of "aggravating circumstances" inflicted by the parent upon the child. 42 U.S.C.A. § 671(a)(15)(D)(i). The reasons underlying enactment of this bypass provision were explained at length by the Committee, as follows:

*225 After many years of growth, especially in the late 1980s and early 1990s, the nation's foster care caseload is now almost 500,000. Recent studies have shown that in some States, the average child removed from the home because of family problems spends almost three years in foster care. Many of these children will never return home; many more will return home one or more times before it becomes evident that their families will not be able to take care of them permanently. And yet, testimony before the Committee, as well as scientific studies, have shown that adoption is an effective way to assure that children grow up in loving families and that they become happy and productive citizens as adults.
There seems to be almost universal agreement that adoption is preferable to foster care and that the nation's children would be well served by a policy that increases adoption rates. Over the past several years, however, witnesses before the Committee have testified that there are a variety of barriers to adoption, some of them Federal. One barrier is the "reasonable efforts" criterion in the Federal statute. This criterion requires States to make reasonable efforts to prevent removing a child from its home and to facilitate returning children to their homes if removal has been necessary. The intent of this policy is to provide services to families so that they can continue to fulfill their child rearing function.
However, there seems to be a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents. As a result, too many children are subjected to long spells of foster care or are returned to families that reabuse them.
The bipartisan group that wrote this legislation recognized the importance and essential fairness of the reasonable efforts criterion. What is needed is not a wholesale reversal of reasonable efforts or of the view that government has a responsibility to help troubled families solve the problems that lead to child abuse or neglect. The Federal government now spends well over $4.5 billion dollars helping these families and their children and the money is well spent. Rather than abandoning the Federal policy of helping troubled families, what is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption.

Thus, the Committee bill would require States to define "aggravated circumstances," such as child torture, chronic abuse, or sexual abuse, in which States are allowed to bypass the Federal reasonable efforts criteria and instead would be required to make efforts to place the child for adoption. In addition, States would be required to bypass reasonable efforts to provide services to families if the parent has murdered a child, committed manslaughter in the death of a child, or has another child for whom parental rights were involuntarily terminated.
[H.R. Rep. No. 105-77, at 7-8 (1997), reprinted in 1997 U.S.C.C.A.N. 1, 2740 (emphasis added).]
Thus, ASFA permitted child protection agencies to bypass the requirement that reasonable efforts of reunification be exerted when the court finds that there are aggravated circumstances, such as abandonment, torture, chronic abuse, and sexual abuse; that there is a homicide of a *226 child; or that the parent has had parental rights to another child terminated. 42 U.S.C.A. § 671(a)(15)(D).
Prior to the enactment of ASFA, "both state and federal law appeared to give primary consideration to the rights of parents, as opposed to the welfare of their children." State ex rel. Children, Youth & Families Dep't v. Amy B., 133 N.M. 136, 61 P.3d 845, 847 (Ct.App.2002). In eliminating the requirement of reasonable efforts under certain circumstances, and in requiring the States to follow suit in order to be eligible for federal benefits, ASFA was responding to perceived excesses in the application of the reasonable efforts requirement. In re Custody and Guardianship of Marino S., 181 Misc.2d 264, 693 N.Y.S.2d 822, 825 (Fam.Ct.1999). The obvious intent of Congress was not to require remedial measures in situations where a court has determined that the parent has subjected the child to aggravated circumstances of abuse. J.S. v. State of Alaska, 50 P.3d 388, 392 (Alaska 2002).
Additionally, ASFA conditions receipt of federal funding upon a State's adoption of a system in which, inter alia, the status of each child in placement is reviewed periodically but no less frequently than once every six months, 42 U.S.C.A. § 675(5)(B); requires a permanency hearing to be held not later than twelve months after the child has been in placement, 42 U.S.C.A. § 675(5)(C); and, under specific circumstances, requires States to seek termination of parental rights and concurrently identify, recruit, and process a qualified family for adoption.[7] 42 U.S.C.A. § 675(5)(E). See also Idaho Dep't of Health and Welfare v. Hays, 137 Idaho 233, 46 P.3d 529, 533-34 (2002) (outlining ASFA's criteria and new requirements).
ASFA clarifies that in determining whether to make reasonable efforts to reunify placed children with their parents, the children's health and safety shall be the paramount concern. 42 U.S.C.A. § 671(a)(15)(A). Thus, in pursuing that goal, ASFA provides that reasonable efforts to reunite children with their parents "shall not be required ... if a court of competent jurisdiction has determined that (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse and sexual abuse)[.]" 42 U.S.C.A. § 671(a)(15)(D)(i). Essentially, ASFA makes clear that a child need not be forced to remain in or be returned to an unsafe home and allows the States to place the safety and welfare of the child before the interest of abusive parents. In Interest of S.A.M., 826 So. 2d 1266, 1276 (Miss. 2002). If reasonable efforts for reunification are not made as a result of a determination made pursuant to 42 U.S.C.A. § 671(a)(15)(D)(i)that they are not required by reason of aggravated circumstancesthen a permanency hearing "shall be held for the child within 30 days after the determination[.]" 42 U.S.C.A. § 671(a)(E)(i); see also N.J.S.A. 9:6-8.54(b)(2).
Although a finding under N.J.S.A. 30:4C-11.3(a) relieves DYFS of the requirement to make reasonable efforts to reunify an abused or neglected child with *227 that child's parent where the court has found that aggravated circumstances exist, the term "aggravated circumstances" has not been defined by our Legislature, despite AFSA providing that that term is to be defined by state law and "may include... abandonment, torture, chronic abuse, and sexual abuse." 42 U.S.C.A. § 671(a)(15)(D)(i).
The Supreme Court has, however, recognized the "strong policy considerations that underscore the need to secure permanency and stability for the child without undue delay." In re Guardianship of DMH, 161 N.J. 365, 385, 736 A.2d 1261 (1999) (citing to In re Guardianship of K.H.O., 161 N.J. 337, 356, 736 A.2d 1246 (1999)). In referencing ASFA, the Court stated, in pertinent part:
On the federal level, the recent trend has been to limit the reasonable efforts social service agencies must undertake to reunite families. Thus, the Adoption and Safe Families Act of 1997 provides that the child's health and safety are the paramount concerns in attempts to reunify families.... Although reasonable efforts are still required by the Act, there are also numerous exceptions to an agency's duty to provide reasonable reunification efforts, such as when the parent has physically endangered the child.... These changes were spurred by congressional concern that the efforts of social service agencies to reunite families often returned children to dangerous homes.... Some commentators have criticized this approach, arguing that services such as targeted reunification programs, drug rehabilitation, and long term services programs, have been useful in producing lower levels of maltreatment and higher rates of reunification.
[DMH, supra, 161 N.J. at 388-89, 736 A.2d 1261 (citations omitted).]
See also In re Guardianship of B.L.A., 332 N.J.Super. 392, 406, 753 A.2d 770 (Ch.Div. 2000) (noting that ASFA, as implemented by N.J.S.A. 9:6-8.87, clarified that the overriding priority is to always protect children, and that "[i]n the final analysis, the futility of reunification efforts must be measured by the family track record").
The ASFA-implementing legislation in New Jersey makes clear that the public policy of our State is
[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare, but the health and safety of the child shall be the State's paramount concern when making a decision on whether or not it is in the child's best interest to preserve the family unit [.]
[N.J.S.A. 30:4C-1(a) (emphasis added to the AFSA amendatory provision).]
The laws of most states, as required by ASFA, contain the "aggravated circumstances" language. Because Congress left it to the States to define what "aggravated circumstances" means, a wide variety of approaches have been found among the States. Although ASFA provides that aggravated circumstances may be defined to include, but not be limited to, "abandonment, torture, chronic abuse, and sexual abuse," our Legislature has chosen to use the term "aggravated circumstances" as a modifier of "abuse, neglect, cruelty or abandonment." N.J.S.A. 30:4C-11.3(a). Stated another way, it appears that the degree, or extent, of the "abuse, neglect, cruelty or abandonment" would seemingly determine whether "aggravating circumstances" are present.
In the absence of more descriptive statutory language, we must construe the provisions of N.J.S.A. 30:4C-11.3(a) in light of the language used and the objective *228 sought to be achieved. Matter of Adoption of N.J.A.C. 7:1I, 149 N.J. 119, 127-28, 693 A.2d 97 (1997). "Primary regard must be given to the fundamental purposes for which the legislation was enacted." Velazquez ex rel. Velazquez v. Jiminez, 172 N.J. 240, 257, 798 A.2d 51 (2002). "To this end, individual statutory provisions should not be read in isolation but rather as parts of a harmonious legislative plan." Barron v. State Health Benefits, 343 N.J.Super. 583, 587, 779 A.2d 460 (App.Div.2001). Generally, "[a]bsent any explicit indications of special meanings, the words used in a statute carry their ordinary and well-understood meanings." State v. Afanador, 134 N.J. 162, 171, 631 A.2d 946 (1993) (citations omitted).
Similar statutes from other states that contain explanatory language and case law on the same subject may serve as guides in construing a statute. Roman Check Cashing, Inc. v. Department of Banking, 169 N.J. 105, 113, 777 A.2d 1 (2001). This is particularly so here, where AFSA has required the States, as a condition of continued receipt of federal funding, to define those aggravated circumstances that will excuse the child protection agency from its statutory obligation to exert reasonable efforts to reunify placed children with their parents.
Several States have simply adopted the listing of conduct contained in 42 U.S.C.A. § 671(a)(15)(D)(i)including, but not limited to, abandonment, torture, chronic abuse and sexual abuseas their definition of aggravating circumstances. See Ga.Code Ann. § 15-11-58(a)(4)(A)(2003); Miss. Code Ann. § 43-21-603(7)(2003); Neb.Rev. Stat. § 43-283.01(4)(a)(2003); R.I. Gen. Laws § 15-7-7(a)(2)(v)(2003); W. Va.Code § 49-6-5(a)(7)(A)(2003); and Wis. Stat. Ann. § 48.355(2d)(1)(West 2003); see also Ala.Code § 12-15-65(m)(1)(2003) (adding "substance abuse" as an aggravated circumstance); Idaho Code § 16-1608(e)(4)(Michie 2003) (adding "felony assault resulting in bodily injury" as an aggravated circumstance); Kan. Stat. Ann. § 38-1502(x)(2003) and Okla. Stat. Ann. tit. 10, § 7303-1.4(B)(3)(a) (West 2003) (adding "life-threatening neglect of a child" as an aggravating circumstance).
Many States have defined "aggravating circumstances" by the gravity or severity of the abuse or neglect, and the threat posed to the safety of the child. In North Carolina, for example, reasonable efforts for reunification after placement shall not be required, inter alia, where the court has determined that the parent has subjected the child to aggravated circumstances, N.C. Gen.Stat. § 7B-507(b)(2) (2002), defined as "any circumstance attending to the commission of an act of abuse or neglect which increases its enormity or adds to its injurious consequences, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse." N.C. Gen. State. § 7B-101(2) (2002) (emphasis added).
Aggravated circumstances are defined in Tennessee as "abandonment of an infant, aggravated assault, aggravated kidnapping, aggravated child abuse and neglect, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated rape, rape, rape of a child, incest, or severe child abuse [.]" Tenn.Code Ann. § 36-1-102(9) (2003) (emphasis added). "Severe child abuse" is further defined as:
(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;
(B) Specific brutality, abuse or neglect towards a child which in the opinion of *229 qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
(C) The commission of any act towards the child [that constitutes aggravated rape, aggravated sexual battery, rape of a child, incest, or aggravated sexual exploitation] or the knowing failure to protect the child from the commission of any such act towards the child; or
(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine ... is occurring.
[Tenn.Code Ann. § 37-1-102(b)(21) (2003).]
In Kentucky, aggravated circumstances are defined, inter alia, as the parent causing the child serious physical injury [.] Ky.Rev.Stat. Ann. § 600.020(2)(e) (Michie 2003) (emphasis added). "Serious physical injury" is further defined to mean "physical injury which creates a substantial risk of death or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily member or organ[.]" Ky.Rev.Stat. Ann. § 600.020(54) (Michie 2003).
In South Dakota, reasonable efforts for reunification are not required, inter alia, where the court has determined by clear and convincing evidence that the parent has "subjected the child to torture, sexual abuse, abandonment for at least six months, chronic physical, mental, or emotional injury, or chronic neglect if the neglect was a serious threat to the safety of the child or another child[.]" S.D. Codified Laws § 26:8A-21.1(3) (Michie 2003). In South Carolina, aggravated circumstances are defined as severe or repeated abuse; severe or repeated neglect; sexual abuse; acts that the court may find constitute torture; or abandonment. S.C.Code Ann. § 20-7-763(C)(1) (Law.Co-op.2003) (emphasis added).
In Nevada, reasonable efforts are not required if the court finds, inter alia, that a parent has caused the abuse or neglect of the child, or of another child of the parent or primary caretaker, which resulted in substantial bodily harm to the abused or neglected child, or caused the abuse or neglect of the child, a sibling of the child or another child in the household, and the abuse or neglect was so extreme or repetitious as to indicate that any plan to return the child to his home would result in an unacceptable risk to the health or welfare of the child [.]" Nev.Rev.Stat. Ann. 432B.393(3)(a) (Michie 2003) (emphasis added).
In Alaska, the court may determine that reasonable efforts are not required if it has found, by a preponderance of the evidence, that, inter alia, the parent has subjected the child to circumstances that pose a substantial risk to the child's health or safety, which circumstances may include abandonment, sexual abuse, torture, chronic mental injury, or chronic physical harm. Alaska Stat. § 47.10.086(c)(1) (Michie 2003) (emphasis added).
In Oregon, aggravated circumstances are defined as, inter alia, a parent, by abuse or neglect, causing serious physical injury to any child, or subjecting any child to rape, sodomy or sexual abuse. Or.Rev. Stat. § 419B.340(5)(a) (2001) (emphasis added). In interpreting the term "aggravated circumstances," the Oregon Court of Appeals has stated, in pertinent part:
First, the ordinary meaning of the verb "aggravate" is "to make worse, *230 more serious, or more severe: INTENSIFY." Webster's Third New Int'l Dictionary, 41 (unabridged ed.1993). Accordingly, as applied in a juvenile dependency proceeding to circumstances bearing on a determination whether to remove a child from a parental home or whether, conversely, a child may be "safely" returned home, "aggravated" circumstances are those involving relatively more serious types of harm or detriment to a child. That interpretation is confirmed by the aggravated circumstances that are specifically enumerated in ORS 419B.340(5)(a), involving, among other things, a parent having caused a child's death or serious physical injury or having subjected a child to rape or other sexual abuse, intentional starvation or torture, or abandonment....
Next, it is significant that ORS 419B.340(5)(a) refers to aggravated "circumstances," rather than to the aggravated actions and conditions of a parent.... That usage indicates that the legislature was concerned, not only with the parents' actions and conditions, but also with the results of those actions and conditions, including effects, direct and indirect, on a child.
* * * *
It is not necessary or possible in this case to determine the entire universe of "aggravated circumstances" within the meaning of ORS 419b.340(5)(a), because we conclude that such circumstances are present here. In particular, ... [the record] discloses that D has suffered severe mental injury as a result of his exposure to significant domestic violence, the parents' drug use, and a highly unstable home life. The record also demonstrates that [the] child has suffered serious psychological and social damage including, among other disorders, posttraumatic stress disorder, oppositional defiant disorder, and parent-child relational disorder and that those disorders were caused, in substantial part, by the parents' conduct, including [the child] witnessing domestic violence.... Consistently with our understanding of ORS 419B.340(5)(a) ..., we conclude that the circumstances here, in their totality, are "aggravated." It follows that, based on the existence of those circumstances, the juvenile court was authorized to find that DHS was not required to make reasonable efforts to make it possible for [the] child to safely return home.
[State ex rel. Juvenile Dept. of Benton County v. Risland, 183 Or.App. 293, 51 P.3d 697, 704-05 (2002).]
The ASFA provisions in the Iowa statute provide, in relevant part, that "[i]f the court determines by clear and convincing evidence that aggravated circumstances exist, with written findings of fact based upon the evidence in the record, the court may waive the requirement for making reasonable efforts." Iowa Code § 232.102(12) (2000). Aggravated circumstances are defined broadly as those, inter alia, where the child has been placed based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of the parent, there is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child, and there is clear and convincing evidence that the offer or receipt of services would not correct the conditions that led to the abuse or neglect within a reasonable period of time. Iowa Code § 232.102(12)(a)-(g); § 232.116(1)(i) (emphasis added).
In Maine, aggravating circumstances are defined as including, but not limited to, a *231 parent subjecting a child to "[r]ape, gross sexual misconduct, gross sexual assault, sexual abuse, incest, aggravated assault, kidnapping, promotion of prostitution, abandonment, torture, chronic abuse or any other treatment that is heinous or abhorrent to society [.]" Me.Rev.Stat. Ann. tit. 22 § 4002(1-B)(A)(1) (2003) (emphasis added). In interpreting this provision, the Maine Supreme Judicial Court stated the statute "gives courts the discretion to identify the most egregious cases, from the early stages of the child protective process, thereby allowing the Department [of Human Services] to move towards achieving children's permanency without providing fruitless reunification services." In re Ashley S., 762 A.2d 941, 947 (Me.2000).
In Missouri, the Division of Family Services may be excused by the court from exercising reasonable efforts to provide reunification services where "[t]he parent has subjected the child to a severe act or recurrent acts of physical, emotional or sexual abuse toward the child, including an act of incest[.]" Mo. Ann. Stat. § 211.183(7)(1) (emphasis added). See In the Interest of A.H., 45 S.W.3d 899, 901 (Mo.App.E.D.2001) (holding that reasonable efforts to reunify were not required where a two year-old child had been subjected to severe recurrent acts of physical abuse consisting of the child being dropped four feet onto concrete by mother's boyfriend breaking child's femur, where the child had other bruises in varying degrees of healing, and had previously required medical attention after he fell down a flight of stairs).
In Pennsylvania, aggravated circumstances are defined, in pertinent part, as where "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent[,]" and "aggravated physical neglect" is further defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." Pa. Stat. Ann. tit. 42, § 6302 (West 2003) (emphasis added). "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." Id. In In re A.H., 763 A.2d 873, 877 (Pa.Super.2000), the court concluded that aggravated circumstances had been adequately established in the form of serious bodily injury, where the mother was a perpetrator by reason of her failure to protect her infant from the repeated physical abuse inflicted by her boyfriend, resulting in multiple fractures, developmental delays in physical functioning and necessitating weekly physical therapy sessions.
In New York, the Department of Social Services is authorized to file a motion, upon notice, requesting a finding that it is excused from providing reasonable efforts to effect reunification where the parent has subjected the child to aggravated circumstances. N.Y. Fam. Ct. Law § 1039-b((b)(1) (McKinney 2003). Aggravated circumstances "means where a child has been either severely or repeatedly abused, as defined in subdivision eight of section three hundred eighty-four-b of the social services law." "Severe abuse" is defined as, inter alia, "the intentional or reckless commission of acts by the parent under circumstances evincing a depraved indifference to human life which results in serious physical injury to the child." N.Y. Soc. Serv. Law § 384-b(8)(a)(i) (McKinney 2003) (emphasis added). By reference, "severe physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or *232 protracted loss or impairment of the function of any bodily organ." N.Y. Penal § 10.00(10) (McKinney 2003). See In re Marino S., 293 A.D.2d 223, 229, 741 N.Y.S.2d 207 (2002) (ruling that sexual abuse of child by parent requiring surgery to repair severe internal injuries and profuse arterial bleeding sufficiently established severe physical injury and aggravating circumstances excusing reasonable efforts of reunification); In re Keith M., 181 Misc.2d 1012, 697 N.Y.S.2d 823 (N.Y.Fam.Ct.1999) (ruling that sufficient proof of severe abuse had been established, excusing reasonable efforts to provide reunification services, where the parent had tied up, gagged, whipped and beaten the child while the child was forced to remain standing, naked, in a cruciform position, on at least four occasions).
Connecticut requires the Commissioner of Children and Families to petition the court for a determination on whether reasonable efforts to reunify the parent and the child are appropriate. Conn. Gen.Stat. Ann. § 17a-111b(a) (West 2003). The court must hold an evidentiary hearing. The court may determine that such efforts are not appropriate if the court finds, by clear and convincing evidence, that the parent has subjected the child to aggravated circumstances, defined as, inter alia, abandonment, sexual molestation or exploitation, severe physical abuse, or engaging in a pattern of abuse of the child. Ibid.
The applicable California statute lists fifteen circumstances where reunification services need not be provided to a parent, if established by clear and convincing evidence. Cal. Welf. & Inst.Code § 361.5(b) (West 2003). Among those circumstances are where the parent inflicts severe physical harm to the child, and the court makes a finding that it would not benefit the child to pursue reunification services with the offending parent. Id. § 361.5(b)(6). A finding of infliction of severe physical harm may be based on deliberate and serious injury inflicted to or on a child's body, deliberate and tortuous confinement of the child, or any other tortuous act or omission that would be reasonably understood to cause serious emotional damage. Ibid. See Pablo S., Sr. v. Los Angeles County Dep't of Children and Family Servs., 98 Cal.App. 4th 292, 300, 119 Cal.Rptr.2d 523 (2002) (affirming denial of reunification services where parents failed to seek medical attention for a period of two months for their six year-old child who had fallen and broken his femur, resulting in disfigurement; during the two-month period, the parents ridiculed and struck the child because of his inability to walk); In re Joshua M., 66 Cal. App.4th 458, 78 Cal.Rptr.2d 110 (1998) (ruling that § 361.5(b) comports with procedural due process by requiring that the court hold a dispositional hearing, that a report be provided on whether reunification services should be provided, and that proof of circumstances justifying denial or reunification services be established by clear and convincing evidence).
The enactment of ASFA represented a substantial shift in the intent and purpose of the child protection system in this country. Prior to AFSA, the Adoption Assistance and Child Welfare Act of 1980 (AACWA), P.L. 96-272, as codified in scattered sections throughout Title 42, restructured federal programs for children removed from their families due to abuse or neglect. Through matching-fund incentives, AACWA required the States to lessen the emphasis on foster care and out-of-home placement by requiring services designed to prevent placement and to make it possible for children to return to their homes. See Kurtis A. Kemper, Construction And Application By State Courts of the Federal Adoption And Safe Families *233 Act And Its Implementation By State Statutes, 2003 A.L.R. 5th 3, § 2.
Significantly, the enactment of AFSA represented a departure from the emphasis in AACWA on the preservation of families by establishing a child protection system that subordinates parental rights to the paramount concern for the health and safety of the child when making a decision on whether or not it is in the child's best interests to preserve the family unit. See N.J.S.A. 30:4C-1(a); In re Guardianship of D.J.M., 325 N.J.Super. 150, 154-55, 737 A.2d 1179 (Ch.Div.1999) (observing that, distilled to its essence, the adoption of ASFA shifted the focus from reunification with biological parents to the safety of the children).
42 U.S.C.A. § 671(a)(15)(D)(i) and N.J.S.A. 30:4C-11.3(a) stand for the proposition that the child protection system should not be required to expend its limited resources on attempting to reunify children with their abusive parents where aggravated circumstances of abuse, neglect, cruelty or abandonment exist and dictate the continued need of the children for protection to "assure that children grow up in loving families and that they become happy and productive citizens as adults." H.R.Rep. No. 105-77, supra, at 8. In weighing the balance between the rights of children and the rights of parents when considering reunification services, the balancing formula should tip on the side of protecting children, and not on the side of protecting the rights of parents.
Still, to bypass the requirement for reasonable efforts of reunification, "aggravating circumstances" must be found to exist. The difficult issue is identifying aggravated circumstances. Resolution of that issue must be viewed through the lens of the legislative intent that the safety of the child is the paramount concern. N.J.S.A. 30:4C-1(a); In re Guardianship of DMH, supra, 161 N.J. at 385, 736 A.2d 1261. Certainly, the determination of whether aggravated circumstances exist must be made on a case-by-case basis. Moreover, we concur with the observation by the Oregon Court of Appeals that it is not possible or necessary for us to determine the entire universe of "aggravated circumstances." See State ex rel. Juvenile Dep't of Benton County v. Risland, supra, 51 P.3d at 705.
However, our review of the legislation and case law in the various States provides guidance in establishing criteria to determine the existence of aggravated circumstances. Although there are a wide variety of approaches among the States, there are common threads, or themes, that are underpinned by the intent and purposes of AFSA, as implemented by our Legislature. We conclude that the term "aggravated circumstances" embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child, and would place the child in a position of an unreasonable risk to be reabused.
Moreover, any circumstances that increase the severity of the abuse or neglect, or add to its injurious consequences, equates to "aggravated circumstances." Whether couched as "severe child abuse or neglect," "serious child abuse or neglect," or "severe physical injury" of a singular, chronic, recurrent, or repetitive nature, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" to the extent that the child welfare agency, here DYFS, may bypass reasonable efforts of reunification. Moreover, where the parental conduct is particularly *234 heinous or abhorrent to society, involving savage, brutal, or repetitive beatings, torture, or sexual abuse, the conduct may also be said to constitute "aggravated circumstances." Additionally, whether the offer or receipt of services would correct the conditions that led to the abuse or neglect within a reasonable time may also be considered.
We note that the existence of aggravated circumstances does not suggest that services are not to be provided at all. Here, for example, the June 26, 2002 order required A.R.G. to submit to a psychological evaluation, counseling, anger management, and parenting skills classes. However, the aggravated circumstances bypass provision of ASFA, as embodied in N.J.S.A. 30:4C-11.3(a), gives the court discretion to identify the most egregious cases at the early stages of the child protective process without providing fruitless reunification services. See In re Ashley S., supra, 762 A.2d at 947.
In reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the trial court's credibility determinations and its "feel of the case" based upon the opportunity of the judge to see and hear the witnesses. Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998); Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988). We are not to disturb the judge's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). Additionally, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, supra, 154 N.J. at 413, 713 A.2d 390.
After analyzing the record in the light of the written and oral arguments advanced by the parties, and considering applicable law, we conclude there was adequate, substantial, credible evidence in the record to support the conclusion of the trial judge that aggravated circumstances of abuse and cruelty had been clearly and convincingly proved, permitting the court to authorize DYFS to bypass the statutory obligation of exerting reasonable efforts of reunification.
The judge's characterization of R.L.G. having been subjected to "a serious savage beating" at the hands of A.R.G. is fully supported by the testimony, photographs, and other evidence in the record. A.R.G.'s argument that the beating he inflicted was an isolated incident is belied by the record. The statements of the children, paternal grandmother, and paternal aunt, as confirmed by the expert evaluations, demonstrate A.R.G. repeatedly subjected R.L.G. to beatings and abuse, and that he had previously subjected C.R.G. to beatings. The inability of his mother, N.G., to control A.R.G.'s violent outbursts and his sister C.G.F.'s statements concerning A.R.G.'s abusive behavior certainly show that the savage beating inflicted upon R.L.G. was far from an isolated occurrence.
The child A.J.G.'s statements to the investigator from the Prosecutor's Office concerning his observations of the May 27, 2002 beating of R.J.G., relating that A.R.G. kept hitting R.L.G. over and over and told R.L.G. that he would beat R.L.G. until he bled, and that "the next time I'll break your arms[,]" reflects depraved behavior. The record also demonstrated that A.R.G.'s pattern of violent and abusive behavior permeated his marriage with M.A.L. and led to their separation. Moreover, the children had witnessed A.R.G.'s *235 abuse of their mother, as well as repeated violence in the home.
It was fully within the province of the trial judge to reject as unpersuasive the evidence adduced by A.R.G. that the children's swimming coach and school principal always observed a wholesome relationship between A.R.G. and the children. We note that those observations were made in a public setting. We take notice that violent and abusive behavior in an interpersonal family setting is more likely to occur in private, behind closed doors, rather than in public view.
We also find unpersuasive A.R.G.'s argument that there were no aggravated circumstances because R.L.G. had suffered no broken bones or prolonged medical treatment. The nature and severity of the beating that R.L.G. had been subjected to on May 27, 2002, at the hands of A.R.G., as graphically depicted by the photographs in evidence; the prior beatings suffered by both C.R.G. and R.L.G.; the medical evidence of the repeated beatings suffered by R.L.G.; the indictment and repudiation of A.R.G.'s abusive behavior by his own mother and sister; and the evidence of prior abusive and violent behavior by A.R.G., are all sufficient indicia and proof of aggravated circumstances of chronic abuse and cruelty, without the necessity of broken bones or prolonged medical care. The totality of the evidence paints a vivid picture of the children and others in A.R.G.'s family household being subjected to a violent and intimidating atmosphere.
We also conclude that the judge properly applied the provisions contained in N.J.S.A. 9:6-8.46 in concluding that all three children were in need of protection by the court. See Division of Youth and Family Servs. v. Robert M., 347 N.J.Super. 44, 68, 788 A.2d 888 (App.Div.) (noting that the abuse of one child may pose a danger to other children in the household), certif. denied, 174 N.J. 39, 803 A.2d 635 (2002); J & E v. M.F., 157 N.J.Super. 478, 493, 385 A.2d 240 (App.Div.) (noting that "predictions as to probable future conduct can only be based upon past performance[,]" and "[e]vidence of parents' fitness or unfitness can be gleaned not only from their past treatment of the child in question but also from the quality of care given to other children in their custody"), certif. denied, 77 N.J. 490, 391 A.2d 504 (1978).
The record established that A.R.G.'s resort to violence was chronic, habitual and repetitive, and endangered the health, safety and welfare of the children. These "aggravated circumstances," within the context of the intent of ASFA that the safety of children be the court's paramount concern, established by clear and convincing evidence that the exertion of reasonable efforts for reunification should be bypassed.
We emphasize that a finding of aggravated circumstances permitting the bypass of the reasonable efforts requirement does not equate to a deprivation of parental rights. See In re Baby Boy H., 63 Cal.App. 4th 470, 477-78, 73 Cal. Rptr.2d 793 (1998). As the trial judge correctly stated, in order to terminate A.R.G.'s parental rights, DYFS must still establish each of the four prongs contained in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence during the guardianship trial.
We have reviewed with great respect the thoughtful dissent of our esteemed colleague. We recognize that this is a difficult case, and we cannot quarrel in technical terms with the procedural due process concerns expressed in the dissent. However, "[d]ue process of law is not a fixed star in the constitutional firmament. It radiates variably in application, `call[ing] *236 for such procedural protections as the particular situation demands.'" Wakefield v. Pinchak, 289 N.J.Super. 566, 570, 674 A.2d 621 (App.Div.1996) (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972)).
Here, as a practical matter, the record adequately demonstrates that the evidence and circumstances forming the basis for the Division's application for permission to bypass the requirement to provide reunification services were well known to A.R.G. and all counsel prior to the June 26, 2002 hearing. Moreover, A.R.G. made no proffereither at the June 26th hearing or in his motion for reconsideration heard on July 17, 2002as to what additional proofs or evidence he would have submitted to challenge the claim that "aggravated circumstances of abuse, neglect, cruelty or abandonment" existed as a result of his conduct. Indeed, everything that could have been submitted was fully before the court; there were no surprises.
Instead, A.R.G. merely relied upon his penitence and sought another opportunity to parent these children. All such pleas to the contrary notwithstanding, the photographs of the brutal beating administered by A.R.G. to R.L.G. fully speak for themselves. When those photographs are considered within the context of the other undisputed evidence presented to the trial judge, the power of the proofs clearly and convincingly supports the finding of aggravated circumstances under any standard or interpretation of that term. As so aptly stated, "`One picture is worth more than ten thousand words.' Chinese proverb." Traver v. Packaging Group, Inc., 242 N.J.Super. 574, 578, 577 A.2d 876 (Law Div.1990).[8]
We also view the placement of the children with their maternal grandparents rather than in foster care as irrelevant on the issue of the presence of aggravating circumstances. Whether the termination of A.R.G.'s parental rights will or should be terminated is not an issue before us in this appeal. Likewise, the issue of whether kinship legal guardianship proceedings are an appropriate alternative to termination of his parental rights is a matter to be advanced to the Family Part by A.R.G. during the guardianship proceedings. The sole question here is whether the Family Partin the child abuse and neglect actionproperly concluded that aggravated circumstances existed. In our view, the uncontroverted clarity of the evidence supports the conclusion reached by the trial judge.
The orders entered in the Family Part on June 26, 2002 and July 17, 2002, are affirmed. The stay of the proceedings in FG-09-217-03 is dissolved and further proceedings in that action may occur.
EICHEN, J.A.D., dissenting.
I respectfully dissent from the opinion of my colleagues affirming the finding of the Family Part that "aggravated circumstances of abuse" were properly established pursuant to N.J.S.A. 30:4C-11.3a, thereby excusing the Division of Youth and Family Services (DYFS or Division) from its statutory obligation under N.J.S.A. 30:4C-11.1b to make reasonable efforts to reunify the children with their father.
*237 Unquestionably, the finding of the Family Part judge that R.L.G. was subjected to "abuse" by A.R.G. is supported by substantial, credible evidence in the record. Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998). See N.J.S.A. 9:6-8.21c. And, I concur with the observations of my colleagues that the evidence presented to the trial judge demonstrated A.R.G.'s repeated abuse of R.L.G., his prior abuse of C.R.G., as well as his abusive and controlling conduct toward other family members, including his deceased wife, his mother and sister. I also agree that the enactment of the Federal Adoption & Safe Families Act of 1997 (ASFA) represented a shift in legislative intent from a child protection system that emphasized the preservation of families to a system that subordinates parental rights to the paramount concern for protecting the health, safety and welfare of children when considering whether it is in the child's best interests to preserve the family unit.
However, I have serious reservations as to whether A.R.G.'s due process rights were sufficiently protected by the procedures followed. The essential requirements of due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L. Ed.2d 556, 567-68 (1972). In this case, not only was A.R.G. deprived of adequate notice of the DYFS application, but there also was insufficient opportunity to allow his counsel to consider or present a defense. The procedures followed here culminated in relieving DYFS of its obligation to make reasonable efforts to reunite A.R.G. with his children, a result that is unsustainable in light of the serious consequences flowing from that discussion, which I will discuss in more detail later in this dissent.
An order to show cause was filed by the Division on May 29, 2002, and an order was entered on that date approving the emergency removal of the children and scheduling the matter for a hearing on June 26, 2002. The order also, among other things, continued custody, care and supervision of the children with DYFS.
A second order was entered also on May 29, 2002. The second order is a form order with pre-printed language, containing a menu of options as to the purpose of the scheduled hearing, the selection of which was to be designated by the insertion of a checkmark, or other mark, in the appropriate space next to one of the following types of hearings: "Case Management Conference"; "Compliance Review"; "Fact Finding"; and "Permanency Hearing." No checkmark appears in any of the spaces provided. And nowhere in the order is there any reference to the fact that a hearing would be held to determine whether "aggravated circumstances of abuse" exist excusing DYFS of its obligation to make reasonable efforts toward family reunification pursuant to N.J.S.A. 30:4C-11.3a.
The only indication in the record on appeal that demonstrates notice to A.R.G. concerning the specific nature of the June 26, 2002 hearing is the June 24, 2002 letter from the Division's counsel to A.R.G.'s counsel, issued only two days prior to the scheduled hearing date, transmitting an "evidence packet" to A.R.G.'s counsel. That letter informed A.R.G., through counsel, for the first time, that the Division intended to request "a finding pursuant to N.J.S.A. 30:4C-11.3(a)[.]" No further explanation is provided in the letter that DYFS intended to seek a ruling relieving DYFS of its obligation to make reasonable efforts toward family reunification on the ground that "aggravated circumstances of abuse" exist. Certainly, no formal pleading, *238 motion, supporting certification, or brief accompanied DYFS's letter.
In my view, two days prior notice, and the nature and manner of furnishing that notice, were insufficient to apprise A.R.G. of the serious consequences that would result if the court acceded to the Division's request for a determination under N.J.S.A. 30:4C-11.3a, denying A.R.G. due process of law. Moreover, I believe that the Division's failure to proceed formally also renders the proceedings and ensuing order a nullity. The eleventh hour transmittal of a "packet of evidence" with a terse reference to the statute does not pass constitutional muster. Instead, DYFS should have indicated in its order to show cause its intention to proceed under N.J.S.A. 30:4C-11.3a if it was seeking to obtain a waiver of DYFS's efforts to reunite A.R.G. with his children. Alternatively, if time was an issue, a motion on short notice could have been subsequently filed and served after DYFS obtained the order to show cause.
As for the lack of a meaningful opportunity to be heard, I highlight the following exchange between counsel for A.R.G. and the court at the June 26, 2002 hearing. This exchange creates serious doubt as to whether A.R.G.'s counsel was afforded an adequate opportunity to address DYFS's "request" under N.J.S.A. 30:4C-11.3a:
[COUNSEL FOR A.R.G.]: Your Honor, I'm asking the court to find that reasonable efforts should have been made
THE COURT: This is not a reasonable efforts case. It's a fact finding case to determine whether or not there was abuse
[COUNSEL FOR A.R.G.]: Your Honor, I
THE COURT:as defined under
[COUNSEL FOR A.R.G.]:I understand.
THE COURT: It's got nothing to do with reasonable effort. So, don'tdon't consume time talking about reasonable efforts.
[COUNSEL FOR A.R.G.]: Okay. So, Your Honor already ruled on that as far as reasonable efforts have been made?
THE COURT: It's not a question of reasonable efforts being offered at this time. The question is whether or not there was abuse committed by [A.R.G.] upon the child.
Although the judge may have been precluding argument on the issue of whether the Division should have provided reasonable efforts to prevent placement under N.J.S.A. 30:4C-11.2a because placement had already occurred, apparently that was not clear to A.R.G.'s counsel because, after this exchange, both counsel for DYFS and the law guardian requested to be heard on the "aggravated circumstances" issue "at the appropriate time." However, without granting argument on that issue, the judge then delivered his opinion, which included a finding that "aggravated circumstances of abuse" had been established. Fundamental fairness required more than this cursory review and adjudication of A.R.G.'s rights in light of the serious consequences that flowed from the judge's finding of "aggravated circumstances of abuse." Aside from relieving DYFS of its obligation to make reasonable efforts to reunite the family, that finding permitted the court to accelerate the proceedings to the end that a guardianship complaint was filed only three months later. In my view, this rush to judgment under the facts of this case is untenable.
Both ASFA, 42 U.S.C.A. § 671(a)(15)(E)(i), and our implementing statute, N.J.S.A. 9:6-8.54b(2), accelerate the required permanency hearing upon a finding that reasonable efforts of reunification need not be made pursuant to *239 N.J.S.A. 30:4C-11.3a. Under those provisions, the permanency hearing must occur within thirty days after such a finding.
By contrast, if a court finds that a child has been subjected to "abuse or neglect" under N.J.S.A. 9:6-8.9 and that placement is required, the initial placement can be for as long as twelve months, N.J.S.A. 9:6-8.54b(1), with a permanency hearing held "no later than 12 months after the child has been in placement." N.J.S.A. 30:4C-61.2a(2).
In this case, the judge conducted a permanency hearing immediately after the finding of "aggravated circumstances of abuse" and approved the Division's permanency plan, namely, termination of A.R.G.'s parental rights to all three children and adoption by the maternal grandparents. Thus, this finding allowed DYFS to abbreviate the time for approving its permanency plan with the result that DYFS could file its guardianship immediately. That complaint was filed on September 18, 2002, just three months after the June 26, 2002 hearing, all because it was excused from making any efforts toward family reunification.
As a result of the judge's ruling, arguably, at least a portion of the third prong of the four-prong "best interests" test justifying termination of parental rights in the guardianship action may have been satisfied. See N.J.S.A. 30:4C-15.1a(3). See also In re Custody and Guardianship of Marino S., 181 Misc.2d 264, 693 N.Y.S.2d 822, 831-33 (N.Y.Fam.Ct.1999), aff'd 293 A.D.2d 223, 741 N.Y.S.2d 207 (N.Y.App.Div.2002). In a guardianship action, ordinarily DYFS is required to demonstrate it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" before termination may be ordered. N.J.S.A. 30:4C-15.1a(3). With the court's finding that DYFS had established "aggravated circumstances" by clear and convincing evidence,[9] it could later be argued in the guardianship action that the reasonable efforts requirement need not be further demonstrated. Ibid. I believe that the shortening of the time in this case, in the absence of appropriate due process safeguards requires a reversal.
Moreover, I have serious reservations as to whether the evidence presented at the factfinding hearing was even sufficient to support a finding of "aggravated circumstances of abuse." The majority opinion reviews, in depth, legislation passed in various states implementing those provisions of ASFA pertaining to "aggravated circumstances of abuse" as permitting waiver of the reasonable efforts requirement of N.J.S.A. 30:4C-11.1b. A critical examination of that legislation, however, reveals a common thread for interpreting the phrase "aggravating circumstances of abuse" as requiring both (1) a finding that the conduct of the parent has subjected the child to serious injury or has placed the child in a position of being at significant risk of serious injury, and (2) that services would not correct the conditions that led to the abuse or neglect within a reasonable period of time.
In this case, there was no medical testimony concerning the full extent and nature of the injury to R.L.G. from A.R.G.'s physical abuse of the child. Nor was there a psychological evaluation of R.L.G., or the other children, which might have afforded some insight into the emotional effects of the abuse on the children. Similarly, there *240 was no psychological evaluation of A.R.G., which might have revealed whether there is any likelihood that services would be able to correct the condition that led to the abuse.[10] The presentation of such evidence would have elicited cross-examination and further exploration of these issues. In the absence of such evidence, I have no confidence that a just result was reached in this case.
The sole evidence presented at the hearing came from the testimony of the DYFS caseworker, which relied substantially on the hearsay statements of others. Unlike the circumstances in In re Guardianship of B.L.A., 332 N.J.Super. 392, 753 A.2d 770 (Ch.Div.2000), this family had no prior history of intervention by the Division. Fundamental fairness required expert testimony and testimony of the adverse family witnesses before the court could properly conclude that DYFS had proved "aggravated circumstances of abuse" by clear and convincing evidence excusing it from making any efforts toward reunification.
Moreover, if the evidence underpinning the trial court's decision in this case can be viewed as supporting a conclusion of "aggravated circumstances of abuse," consider how many other cases alleging child abuse under N.J.S.A. 9:6-8.21 could arguably fit within the definition of "aggravated circumstances of abuse" under N.J.S.A. 30:4C-11.3a; see also N.J.A.C. 10:133I4.3.[11] I respectively suggest that the majority has not articulated a useful standard for determining when "serious abuse" or "aggravated circumstances of abuse" has occurred. For instance, it is not clear whether conduct alone is sufficient to establish a case of "aggravated circumstances of abuse" or whether the effect of that conduct must be factored into the equation. If the "effect" is a vital component, then expert evidence must be presented to aid the fact-finder to reach a just result.
Finally, I would be remiss if I did not question whether ASFA's approval of the waiver of the reasonable efforts requirement in cases of "aggravated circumstances of abuse" was intended to expedite termination proceedings to free abused children for adoption who are not languishing in foster care. See H.R. Rep. 105-77, at 7 (1997), reprinted in 1997 U.S.C.C.A.N. 1, 2739-40. Here, it seems the children have been safely placed with caring grandparents. N.J.S.A. 30:4C-15.3a provides that DYFS shall not be required to file a petition seeking the termination of parental rights if "[t]he child is being cared for by a relative and a permanent plan for the child can be achieved without termination of parental rights[.]" Again, these children have been placed with their maternal grandparents, with whom they have previously resided and therefore, in my view, there is no reason for these accelerated proceedings. Notably, the children are not infants. A.J.G. recently turned nine years old; R.L.G. is ten; and C.R.G. is sixteen.
I also note that the rush to judgment in this case essentially precludes consideration *241 of a permanency alternative that arguably could be appropriate in a case of this nature, namely, a "kinship legal guardianship arrangement." See N.J.S.A. 30:4C-84 to -88 (providing for a kinship legal guardianship arrangement as an alternative disposition and permanent placement once children have been residing in the home of a relative for a period of twelve consecutive months). But I draw no conclusions in that regard in the absence of briefing on the issue. Suffice it to say, given the fact that these children are safely placed in a secure and familiar environment with their maternal grandparents in Florida, and that the criminal charges against their father have not as yet been resolved, the rush to achieve permanency for these children which is applicable to the foster placement of an abused child seems ill-advised under our system of justice.
For all of these reasons, I would reverse and remand the matter to the Family Part for further proceedings consistent with this opinion.
NOTES
[1] There was no objection by A.R.G. to the placement of the children with the maternal grandparents in Florida, and they were placed there on July 3, 2002.
[2] This letter was not initially filed as part of the record on appeal. At argument, upon our inquiry concerning prior notice of DYFS's application for a finding that no reasonable efforts to reunify were required, counsel produced same and we now incorporate it into the record.
[3] N.J.S.A. 9:6-8.87 excuses DYFS from the requirement to provide reasonable efforts to reunify a placed child with a parent if an exception to that requirement has been established in accordance with N.J.S.A. 30:4C-11.3.
[4] N.J.S.A. 30:4C-11.2 provides, inter alia, that upon a finding that the parent has subjected the child to aggravated circumstances of abuse, neglect, cruelty or abandonment, the court may excuse DYFS from its obligation to provide reasonable efforts to prevent placement. N.J.S.A. 30:4C-11.3 provides, inter alia, that upon such a finding the court may excuse DYFS from its obligation to provide reasonable efforts to reunify the child with a parent. However, when an emergency removal is effected, DYFS "shall not be required to provide reasonable efforts to prevent placement if removal of the child is necessary due to imminent danger to the child's life, safety or health[.]" N.J.S.A. 9:6-8.29(a). Accordingly, it is clear that the judge intended to refer to N.J.S.A. 30:4C-11.3(a).
[5] N.J.S.A. 9:6-8.54(b)(2) requires the court to conduct a permanency hearing no later than 30 days after placement in cases where the court has determined that reasonable efforts to reunify the child with the parent are not required pursuant to N.J.S.A. 30:4C-11.3.
[6] We recognize that DYFS is statutorily empowered to bring concurrent but separate Title 9 abuse and neglect proceedings, and Title 30 guardianship proceedings against the same parties. New Jersey Div. of Youth and Family Servs. v. K.M., 136 N.J. 546, 550, 643 A.2d 987 (1994).
[7] Pursuant to N.J.S.A. 30:4C-15, as amended to comply with ASFA, when DYFS has determined that the statutory criteria for termination have been satisfied, a guardianship petition seeking termination of parental rights shall be filed "no later than when the child has been in placement for 15 of the most recent 22 months, unless the division establishes an exception ... in accordance with [N.J.S.A. 30:4C-15.3]." Those exceptions include where "[t]he child is being cared for by a relative and a permanent plan for the child can be achieved without termination of parental rights." N.J.S.A. 30:4C-15.3(a).
[8] The correct phrase is "One picture is worth a thousand words" a misattributed Chinese proverb explained in John Bartlett, Bartlett's Familiar Quotations, p. 851, footnote 2, Seventeenth Edition (2002), as follows: "`One look is worth a thousand words.' Fred R. Barnard, in Printers' Ink, 8 Dec., 1921, p. 96. He changed it to `One picture is worth a thousand words' in Printers' Ink, 10 March, 1927, p. 114, and called it `a Chinese proverb, so that people would take it seriously.'Burton Stevenson, ed., The Home Book of Proverbs, maxims, and Familiar Phrases [1948]."
[9] In a factfinding hearing, any determination that a child is an abused or neglected child must be based on a preponderance of the evidence. N.J.S.A. 9:6-8.46b(1). Here, the judge found the existence of aggravated circumstances by clear and convincing evidence.
[10] While I recognize that a psychological evaluation was ordered here, it was not obtained until after the determination to relieve DYFS of its obligation to provide services.
[11] N.J.A.C. 10:133I4.3 reads, in pertinent part:

(a) The Division shall not be required to provide reasonable efforts to reunify the child with a parent pursuant to N.J.S.A. 30:4C-11.3 if a court of competent jurisdiction has determined that:
1. The parent has subjected the child to aggravated circumstances of abuse, neglect, cruelty or abandonment. Aggravated circumstances may include, but are not limited to, torture and chronic or severe abuse[.] (Emphasis added.)