# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2656-19T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

 D.C.,

     Defendant-Appellant,
and

C.A.R.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.E.R.,
a minor.

_____

Argued November 30, 2020 – Decided January 14, 2021

Before Judges Fasciale and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0056-19.

Beatrix W. Shear, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Beatrix W. Shear, on the briefs).

Jane C. Shuster, Assistant Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Shuster, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Meredith Alexis Pollock, Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, of counsel; Margo Hirsch, Designated Counsel, on the brief).

PER CURIAM

Defendant D.C. (the mother) appeals from a January 28, 2020 order terminating her parental rights to her son C.E.R. (the child), who was born in 2012.[1] The mother has a substance abuse problem and a history of homelessness. She was living with her son in a car when the Division of Child Protection and Permanency (the Division) removed the child. The mother also has a criminal record, including a conviction for child endangerment. Throughout this litigation she has demonstrated little to no interest in reunifying

---

[1] The order also terminates the parental rights of the father, C.A.R. He is not a party to this appeal.

with her son, having repeatedly failed to take advantage of offered services and visitation opportunities. Meanwhile, Division workers consistently reported that the child adapted well and appeared to be thriving and bonding with his resource family, who wish to adopt as opposed to pursuing kinship legal guardianship. The child advanced developmentally in the resource home, with marked improvements to his previously limited vocabulary and motor skills. Judge Honora O'Brien-Kilgallen presided over the guardianship trial, entered judgment, and rendered a thorough and detailed oral opinion. We affirm substantially for the reasons stated by Judge O'Brien-Kilgallen on the record.

On appeal, the mother argues:

POINT I

THE TRIAL COURT'S BLANKET DECISION OVERRULING ALL OF THE EMBEDDED HEARSAY/RELEVANCE OBJECTIONS MADE BY D.C.'S ATTORNEY, MR. FRAIDSTERN, WAS AN ERROR THAT MANDATES REMAND

POINT II

THE TRIAL COURT ERRED BY ALLOWING [DIVISION] WORKER GREGORIO TO TESTIFY WITHOUT PERSONAL KNOWLEDGE

POINT III

THE GUARDIANSHIP DECISION IN THIS CASE SHOULD BE REVERSED BECAUSE DCPP FAILED TO PROVE PRONGS ONE, THREE, AND FOUR OF

THE N.J.S.A. 30:4C-15.1(a) TEST FOR TERMINATION OF PARENTAL RIGHTS BY CLEAR AND CONVINCING EVIDENCE

A. DCPP DID NOT PROVE N.J.S.A. 30:4C-15.1(a)(1), BECAUSE IT DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT [MOTHER] HARMED [C.E.R.] OR THAT [C.E.R.'S] CONTINUED RELATIONSHIP WITH [MOTHER] WOULD ENDANGER HIS SAFETY, HEALTH, OR DEVELOPMENT

B. DCPP DID NOT PROVE THE REASONABLE EFFORTS REQUIREMENT OF N.J.S.A. 30:4C-15.1(a)(3) BY CLEAR AND CONVINCING EVIDENCE

C. DCPP DID NOT PROVE N.J.S.A. 30:4C-15.1(a)(4), THAT TERMINATION WOULD NOT DO MORE HARM THAN GOOD, BY CLEAR AND CONVINCING EVIDENCE

POINT IV

THE GUARDIANSHIP ORDER IN THIS CASE SHOULD BE REVERSED BECAUSE DCPP IMPROPERLY RUSHED TO FACILITATE ADOPTION OF [C.E.R.] BY MS. AND MRS. W

I.

We begin by addressing the mother's contention that the Division inappropriately expedited the guardianship process and rushed to facilitate the child's adoption at the expense of reunification efforts. To provide context for

4

her claim that the Division sought termination of her parental rights prematurely, we briefly recount the sequence of events leading to the guardianship trial.

On September 4, 2018, police were called to conduct a welfare check after receiving information about a family living in a car parked at a local QuickChek.[2] Police found the then-six-year-old child living in the car with his parents. The mother reportedly had heroin in her hands, and both parents admitted to being active drug users. The parents were arrested for child endangerment and possession of heroin, marijuana, and drug paraphernalia. At the police station, the mother was introduced to Division workers who expressed concern for the child's safety and well-being. The workers explained the emergency removal process and instructed the mother to apply for a public defender. They also discussed the Division's policies regarding visitation and reunification. The mother asked to remain informed as to her son's whereabouts. The workers emphasized that it was the mother's responsibility to maintain communication with the Division if she wanted to pursue reunification with her son.

---

[2] This was not the family's first interaction with the Division. The Division had previously received referrals from Child Welfare Services, but they were not substantiated.

On September 6, 2018, Judge Teresa Kondrup Coyle granted an order to show cause for temporary custody. Judge Coyle further ordered that:

> The Court upholds the emergent removal of the child [C.E.R.]. [C.E.R.] shall remain in the legal and physical custody of the Division.
>
> The mother shall submit to a substance abuse evaluation and comply with any treatment recommendations.
>
> The father shall submit to a substance abuse evaluation and comply with any treatment recommendations.
>
> The parents shall sign releases for all current and former treating physicians, hospitals, and treatment programs.
>
> The parents shall have weekly visitation with [the child], supervised by the Division or a Division-approved supervisor.
>
> The parents shall notify the Division when they are released from [Monmouth County Correctional Institution] and keep the Division updated on the status of their criminal case.

Judge Terence P. Flynn presided over the order to show cause hearing on October 5, 2018. Neither parent attended. Judge Flynn ordered that the child remain in the custody of the Division. In December 2018, the child was placed in a new resource home with the mother's cousin and his wife.

6

Judge Flynn convened a fact-finding hearing in February 2019. As would become her standard practice throughout this litigation, the mother did not attend the court proceeding. Judge Flynn determined by a preponderance of evidence that both parents abused or neglected the child by failing to provide shelter and by possessing illicit drugs and paraphernalia in the presence of the child. The mother was ordered to complete substance abuse evaluations and to comply with the Division's recommendations.

The mother failed to maintain contact with the Division. On February 8, 2019, case worker Meghan Clemente happened to see the mother while investigating another matter. Ms. Clemente used this chance meeting as an opportunity to explain the seriousness of the mother's failure to contact the Division. As Ms. Clemente reported,

> [D]ue to the length of time there has been no contact, worker would recommend that visits start as therapeutic[;] however[,] she had to contact the Division. Worker informed her that worker was aware of her concerns regarding her [bench] warrant [for failure to appear at a hearing on her criminal matter] and promised that DCPP did not try and trick people by making them come to the office and then having them picked up. Worker explained to her that it was very possible that [the child's] case goal would be changed to adoption should she still choose to not be in contact with the Division.

Eleven days after her discussion with Ms. Clemente, the mother finally contacted the Division to arrange for a meeting with the case worker. Although the Division scheduled a substance abuse evaluation for the mother, she did not appear at the evaluation and subsequently failed to remain in contact with the Division. The Division conducted an active search for both parents, which proved unsuccessful.

As the mother's whereabouts remained unknown and because she made no attempts to visit her child, the Division opted to pursue termination of parental rights followed by adoption. On May 6, 2019, Judge Flynn convened a permanency hearing and approved the Division's goal.

Once the decision was made to pursue termination of parental rights, an adoption case worker, Jennifer Gregorio, was assigned to the case. Ms. Gregorio continued the Division's efforts to locate the mother, finally meeting with the mother at a mall food court in June 2019. The appointment was scheduled, as opposed to previous Division worker Ms. Clemente's encounter. Ms. Gregorio introduced herself and explained why the case had been assigned to the adoption unit. During their conversation, Ms. Gregorio offered to arrange another substance abuse evaluation and to expedite intake for a treatment program, but the mother declined. Additionally, Ms. Gregorio scheduled psychological and

bonding evaluations with Dr. Lori Lessin.  As per her usual practice, the mother failed to attend the evaluations.

Judge O'Brien-Kilgallen convened the guardianship trial over three non-consecutive days in late December 2019 and late January 2020.  The mother did not attend any portion of the trial.

We consider these events in light of the applicable legal principles.  The court is required to hold a permanency hearing to determine a child's permanency placement no later than twelve months after a child enters foster care.  N.J.S.A. 9:6-8.54(b)(2); N.J.S.A. 30:4C-61.2(a); N.J. Div. of Youth & Family Servs. v. A.R.G., 361 N.J. Super. 46, 65 (App. Div. 2003).  The permanency hearing functions to determine if reunification is an appropriate goal or whether an alternative goal is required.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 400 (2009).  Permanency is deemed to be better than protracted efforts for reunification.  N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 112 (App. Div. 2004).  As we noted in N.J. Div. of Youth & Family Servs. v. A.G., "[k]eeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law."  344 N.J. Super. 418, 438 (App. Div. 2001).

In this instance, the permanency hearing held on May 6, 2019 occurred less than twelve months after the guardianship complaint was filed but fifteen months after the emergency removal. The Division's decision to shift the goal from reunification to adoption, moreover, was carefully reviewed and approved by the trial judge at the permanency hearing.

The timing of the permanency hearing complies with N.J.S.A. 9:6-8.54(b)(2) and 30:4C-61.2(a). These statutes provide that the court shall hold the permanency hearing "no later than 30 days after placement in cases in which the court has determined that reasonable efforts to reunify the child are not required[,]" or, if the court determined that reunification efforts are required, "no later than 12 months after placement[.]" N.J.S.A. 9:6-8.54(b)(2). The record shows, moreover, that the mother had notice of the hearing and that Ms. Clemente informed her of the Division's new goal during their February 7, 2019 scheduled meeting at the mall food court.

In these circumstances, we believe the Division did not act with undue haste in reaching its decision that termination of parental rights and adoption would best serve the child's needs. That decision was made only after the mother demonstrated that she was not prepared to take the steps needed for reunification. As we explain further in Section III(C), infra, we agree with Judge

10

O'Brien-Kilgallen's conclusion that "permanency should not be delayed because of [the mother's] lack of involvement."

## II.

We next address the mother's contention that the trial judge improperly admitted hearsay evidence by allowing Ms. Gregorio to testify to the content of reports and records prepared by other Division workers involved in the case. The mother also argues the judge improperly issued a "blanket" decision overruling her series of hearsay and relevance objections with regard to Ms. Gregorio's testimony. We disagree. Because we affirm for the reasons explained in the judge's thoughtful evidentiary ruling, we need not re-address the mother's hearsay arguments at length. We add only the following remarks.

A trial court's evidentiary decisions are reviewed under the abuse of discretion standard. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017). This includes hearsay rulings. Ibid. See also Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 379 (2007). The danger of hearsay, moreover, is mitigated in a bench trial. See N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016).

Rule 5:12-4(d) permits the Division to "submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional

consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal." The Division's reports, moreover, fall under the business records exception found in N.J.R.E. 803(c)(6). This exception provides for "[a] statement contained in a writing or other record of acts, events, conditions . . . made at or near the time of observation by a person with actual knowledge or from information supplied by such person" that is written or recorded "in the regular course of business[,]" and if it is "the regular practice of that business to make [a] writing or other record." N.J.R.E. 803(c)(6). See also N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 347 (2010).

We believe that Judge O'Brien-Kilgallen did not abuse her discretion in ruling that the reports prepared by various case workers were admissible under the business record exception. The judge was mindful, moreover, of the need to differentiate embedded hearsay, that is, out-of-court statements made by others memorialized in the case worker reports. Judge O'Brien-Kilgallen explained that she would not allow inadmissible hearsay statements to be swept into evidence because such statements are surrounded by permissible business records text. The judge further noted that "[hearsay] statements made by others are inevitably going to be intertwined with the Division's records, as they are

relevant in how the Division carries out their statutory duties." Accordingly, Judge O'Brien-Kilgallen announced that when considering Ms. Gregorio's testimony and the reports and records she discussed, the judge would distinguish between embedded out-of-court statements offered for their truth—which is inadmissible hearsay—and those offered, for example, to explain why the Division was motivated to act. See Carmona, 189 N.J. at 376 (holding that a report that shows the motivation behind an action is admissible as to the action, even if not admitted for the truth of matters asserted in the document). The judge thus made clear that she would not consider embedded hearsay unless it was an admission against interest made by a parent.

In view of these explicit assurances, we are satisfied that the judge did not rely on inadmissible hearsay statements as substantive evidence. We note that the mother points to no factual finding that was supported by inadmissible embedded hearsay. On the contrary, Judge O'Brien-Kilgallen made factual findings and further identified competent evidence supporting those findings in her detailed oral ruling.

We likewise reject the mother's related contention that the trial judge abused her discretion by allowing Ms. Gregorio to testify as to matters of which she had no personal knowledge. The mother claims that the witness, under the

13

guise of refreshed recollection, merely recited information gleaned from the reports and records prepared by other Division case workers. This contention does not warrant extensive discussion. It is well-established that "under both the New Jersey and federal rules of evidence, the foundation witness generally is not required to have personal knowledge of the facts contained in the record." Hahnemann Univ. Hosp. v. Dudnick, 292 N.J. Super. 11, 17–18 (1996). In In re Guardianship of Cope, moreover, we recognized that Division case worker reports "supply a reasonably high degree of reliability as to the accuracy of the facts contained therein." 106 N.J. Super. 336, 343–44 (App. Div. 1969). We acknowledged the practical aspects of a guardianship trial, noting,

> we are dealing here with a statutory scheme established to provide a means by which the Bureau [predecessor to the Division] or other petitioner may obtain guardianship of children in the Bureau's custody. As the Bureau and the court below both properly indicate, a rule requiring all Bureau personnel having contact with a particular case to give live testimony on all the matters within their personal knowledge would cause an intolerable disruption in the operation of the Bureau.
>
> [Id. at 343.]

In view of this long-established practice in guardianship trials, we reject the mother's argument that Ms. Gregorio's foundation testimony was improper. The alternative would have been to require the other Division employees who

14

worked on the case to testify, which would have imposed an "intolerable disruption" in the Division's operation. Ibid. In Cope, we further recognized that "[i]n a situation such as this it is of great importance that the evidence upon which judgment is based be as reliable as the circumstances permit and that the answering parent be given the fullest possible opportunity to test the reliability of the petitioner's essential evidence by cross-examination." Ibid. In this instance, Ms. Gregorio's testimony relating to information contained in the reports prepared by other Division workers provided an additional layer of protection by affording the mother's counsel the opportunity to cross-examine Ms. Gregorio with respect to her notes and the Division reports and records.[3]

## III.

We next address the mother's contention that the Division failed to satisfy its burden of proof at the guardianship trial. Specifically, she contends that the Division failed to prove three of the four prongs of the best-interests-of-the-

---

[3] The mother also contends that Ms. Gregorio's testimony violates the best evidence rule set forth in N.J.R.E. 1002. That argument lacks sufficient merit to warrant discussion, R. 2:11-3(e)(1)(E), as N.J.R.E. 1002 applies to writings or photographs, not testimony.

child test codified in N.J.S.A. 30:40-15.1(a).[4] We disagree. We begin our analysis by acknowledging certain foundational principles. There exists a well-settled legal framework regarding the termination of parental rights. A parent has a constitutional right to raise his or her biological child, which "is among the most fundamental of all rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102 (2008)); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. G.M., 198 N.J. at 397; In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. Specifically, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

---

[4] The mother acknowledges that the Division proved the second prong of the statutory test, N.J.S.A. 30:4C-15.1(a)(2), by clear and convincing evidence. That prong requires proof that the parent is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604–11. The four prongs of the test are "not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that addresses the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)). The trial court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs."

N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing J.C., 129 N.J. at 10). When applying the best-interests test, moreover, a trial court must pay careful attention to a child's need for permanency and stability without undue delay. In re Guardianship of D.M.H., 161 N.J. 365, 385–86 (1999).

Our review of a family judge's factual findings in a guardianship trial is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Findings by a Family Part judge are "binding on appeal when supported by adequate, substantial, and credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). We may reverse a factual finding only if there is "'a denial of justice' because the family court's 'conclusions are [] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting E.P., 196 N.J. at 104). Accordingly, an appellate court should not disturb the trial court's factfinding unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484). "[T]he conclusions that

logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

After carefully reviewing the record in light of the applicable legal principles, we conclude that the Division proved all four prongs by clear and convincing evidence. We do so substantially for the reasons given by Judge O'Brien-Kilgallen in her thorough oral opinion. We add the following remarks with respect to each of the three prongs that the mother challenges on appeal.

A.

The mother argues that Judge O'Brien-Kilgallen erred in finding that the child was physically, emotionally, or psychologically harmed by her behavior. Under the first prong of the best-interests test, the trial court examines the effect of the harm that stems from the parent-child relationship over time. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). The court may consider both physical and psychological harm and, therefore, may base its termination decision on emotional injury in the absence of physical harm. See In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977) ("The absence of physical abuse or neglect is not conclusive on the issue of custody. The trial court must consider the potential for serious psychological damage to the child inferential from the proofs."). Furthermore, "[a] parent's withdrawal

19

of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379 (citing K.H.O., 161 N.J. at 352–54). Stated differently, "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (emphasis added) (citing J.C., 129 N.J. at 18).

In this instance, Judge O'Brien-Kilgallen found, based on credible evidence including expert testimony, that "[the child's] relationship with his parents caused him physical harm, stunted his development, and caused lasting emotion harm which would likely continue if the parental relationship was not terminated." In reaching this conclusion, the judge accounted for a number of salient circumstances that were proved by the Division. Notably, the family lived in a vehicle and the child was not enrolled in school. It also bears emphasis that the mother was convicted of child endangerment. In view of her guilty plea, she is hard-pressed to argue on appeal that the child was not harmed by her behavior.

We likewise reject the mother's argument that Judge O'Brien-Kilgallen erred in finding that the Division had proved the third prong of the best-interest test by clear and convincing evidence. Under this prong, the trial court must decide if the Division made reasonable efforts to reunify the family. K.H.O., 161 N.J. at 354 (citing N.J.S.A. 30:4C-15.1(a)(3)). Pursuant to the statute, "reasonable efforts" are defined as:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

We have previously recognized that reasonable efforts "vary depending upon the circumstances of the removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007) (citing A.G., 344 N.J. Super. at 437). The Division's success regarding this prong is not measured by the parent's participation in the necessary services. D.M.H., 161 N.J. at 393.

"[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. Pursuant to statute, the Division must: (1) work with parents to develop a plan for services; (2) provide the necessary services; (3) facilitate visitation; and (4) notify parents of the children's progress during an out-of-home placement. N.J.S.A. 30:4C-15.1(c).

In this case, the record amply supports the trial judge's determination that the Division made reasonable efforts to help the mother correct her parental deficiencies and that the Division pursued alternatives to termination. The mother's evasiveness, however, effectively thwarted the Division's reunification efforts. The Division worked indefatigably to contact the mother, using old phone numbers, mailing letters, reaching out to her family members, and even using Facebook. Further, the Division repeatedly advised the mother that it was her responsibility to remain in contact with the Division. We are satisfied that the lack of interaction with the Division is attributable entirely to the mother and despite reasonable efforts by the Division to maintain contact.

Furthermore, the mother was afforded numerous opportunities to pursue treatment for her substance abuse, which she declined.[5] She did not attend the

---

[5] The mother entered a detox program in late December 2018 to prepare for a fourteen to twenty-eight-day inpatient treatment program. She began the

A-2656-19T1

bonding evaluation that was twice rescheduled for her benefit. She did not appear at any court hearings despite the Division's persistent efforts to inform her of upcoming and ongoing proceedings.

In sum, the fact that reunification failed in this case by no means suggests that the Division did not make reasonable efforts to achieve that goal. As Judge O'Brien-Kilgallin aptly noted in her oral decision, "[t]he parents, whether they are unable to follow through with services or unwilling to do so, have abandoned any efforts to become fit parents, and permanency should not be delayed because of their lack of involvement." In short, the mother, not the Division, is responsible for the failure to achieve reunification.

## C.

Finally, we address the mother's contention that the Division failed to prove the fourth prong of the best-interests test, which requires that the Division demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). When conducting its analysis under this prong, a trial court may rely on expert testimony when balancing the potential injury that a child could experience

---

inpatient program on January 1, 2019 but left on January 7, 2019, contrary to medical advice.

 A-2656-19T1

through the termination of parental rights against the harm the child might suffer if removed from the resource placement. K.H.O., 161 N.J. at 355, 363. Termination of parental rights is necessary when it permits a child to have a secure and permanent home. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592–95 (App. Div. 1996). Relatedly, a child should not "languish indefinitely" in an out-of-home placement while a parent tries to correct his or her parenting difficulties. N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007) (citing N.J. Div. of Youth & C.S., 367 N.J. Super. at 111). In K.H.O., the Supreme Court affirmed the trial court's decision to terminate parental rights, holding that "where it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy the [fourth prong of the best-interests test]." 161 N.J. at 363.

Furthermore, in evaluating evidence under the fourth prong, the child's need for permanency continues to be an important consideration. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). "[I]f one thing is clear, it is that [a] child deeply needs association with a nurturing adult. Since it seems generally agreed that permanence in itself is an important part of

24

nurture, a court must carefully weigh that aspect of a child's life." A.W., 103 N.J. at 610.

In this instance, Judge O'Brien-Kilgallen placed appropriate emphasis on the need to afford the child a sense of permanency. In reaching her conclusion, the judge relied on credible expert testimony from the Division's expert, Dr. Lessin, who recommended that the child remain with his resource family because they had developed a loving, bonded relationship.[6]

Furthermore, the child expressed his desire to stay with his resource family permanently. The mother contends on appeal that the Division "unfairly swayed" the child to express a desire to be adopted by his resource family. We find no support in the record for this assertion. The fact that the child told Division workers that he wants to see his mother does not suggest that the

---

[6] The resource parents testified at the guardianship trial and expressed their preference for adoption rather than kinship legal guardianship (KLG). One resource parent explained:

> Well, why do I want to adopt him, is cause we love him. He is part of our household. He – why I want adoption over K.L.G. is, because he's seven years old, he – he needs to know he has a permanent home [and] that he will never have to go back to a situation that he was in prior to this.

Division convinced him to express his desire for adoption. Defendant also asserts that "[o]nce [the mother's] rights to [the child] are terminated, [she] will become a legal stranger to her son with no right to post termination visitation." The record belies this assertion. The resource parents testified that they would consider therapeutic visits so long as the mother is sober. We agree with the Division that requiring sobriety as a condition of post-termination visits is reasonable and appropriate, consistent with Dr. Lessin's expert recommendation.

In sum, we conclude that the mother has repeatedly demonstrated that she is unfit as a parent and is unable or unwilling to make the lifestyle changes necessary to provide a safe and stable environment for her son. As we noted in A.G., "[k]eeping [a] child in limbo, hoping for some long-term unification plan, would be a misapplication of the law." 344 N.J. Super. at 438. Termination of the mother's parental rights was therefore appropriate and necessary to afford the child a permanent home in which he will be safe, loved, and cared for.

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-2656-19T1